Mayor, &c. *v.* The Commissioners of SPRING GARDEN.

The grant by the legislature of an exclusive right to the water-power of a navigable stream, does not pass a title to the *corpus* of the water, or prevent its use for the ordinary purposes of life.

Hence, where the legislature granted the privilege and title to all the water-power of the river Schuylkill, and made a subsequent grant to the districts of Spring Garden and Northern Liberties, of the right to erect works and supply their inhabitants with water from the river—and such works were erected to be propelled by steam—such grant and the acts done thereunder, are not in violation of the previous grant of the water-power.

*Feb.* 3—8.    THIS was an appeal from a decree made on the equity side of this court by the late Mr. Justice KENNEDY, at *Nisi Prius.*

The bill was filed on the 15th March, 1844, by the Corporation of the City of Philadelphia, against the Corporation of Spring Garden and the Northern Liberties, and certain individuals who, under the direction of those corporations, were erecting the works complained of in the bill.(*a*)

The bill set forth that Robert Kennedy was authorized by the act of 1807 to erect a mill-race near the Falls of Schuylkill, and draw so much water from the river as might be necessary for a grist and saw-mill, provided that if the city of Philadelphia should at any time be desirous of erecting works to conduct the water of the river into the city, that right was reserved; but if such erections should injure the works of Kennedy, his expenses, with twenty-five per cent. addition, should be paid on his conveying his right to the premises. In 1810 Kennedy conveyed all his water-right to Josiah White in fee. That by the acts of 1815 and 1816, the corporation of the Schuylkill Navigation Company were incorporated and authorized to improve the navigation of the river, (between points including that at which the cause of the present controversy was situated,) and that corporation was thereby declared " should have the privilege and *be entitled to all the water-power from the said river, sluices or canals,* to propel such machinery as they may think proper to erect on the land; *or* (they) *may sell in fee-simple, lease, or rent for one or more years, the said water-power to any person or persons,* to be used in such manner and upon such terms as they may think proper, provided it be so done that it shall not at any time impede or interrupt the navigation; and the company shall

(*a*) There was much discussion as to the effect of laches imputed to the complainants; but the evidence and arguments are omitted, since the cause was decided upon a point entirely distinct.

apply the money arising from the sale to the improvement of the navigation, or repairing any damage that the locks or dams might have sustained."

That by articles of agreement between the Navigation Company and Josiah White, the latter was authorized to erect a dam at the Falls, and was vested with all the right to all the water-power there created, which the company was entitled to grant; provided it was so drawn off as not to impede the navigation of the river or canal. That a part of White's interest became vested in Gillingham, both of whom, in 1819, conveyed to the corporation, (plaintiffs,) in consideration of $150,000, all their right of water-power at the Falls, and generally of and in all the water-power of the river, and all the rights acquired from the Navigation Company.

That in the same year the plaintiffs made an agreement with the Navigation Company, reciting that plaintiffs were desirous of increasing their supply of water for the use of the city, and for the purpose of vending the same to the adjoining districts by means of an enlarged power to be obtained by a dam to be built near their water-works, and that the Navigation Company were willing to give effect to the same. It was therefore agreed that the plaintiffs would erect a dam at Fairmount, to raise the water as high as was contemplated under the agreement with White, and that the Navigation Company were authorized to draw off as much as they thought necessary for the navigation, and that the plaintiffs were to enjoy the residue for the purposes mentioned, but not to sell, lease, or dispose of any water-power, nor to use the water-power for manufacturing purposes. The plaintiffs also agreed to erect guard-locks, chambers, tail-race, toll-house, &c., for the company, and pay all damages occasioned by the erecting of the works at Fairmount.

That in the year 1824, in consideration of $26,000 paid to the Navigation Company, the plaintiffs purchased of them the right to take *all the water and water-power* that remained after drawing off from the river so much as was required for the navigation, and to use and sell the same without restriction. (In this agreement it was provided, that if at any time the water should be drawn off below the surface of the dam, the Navigation Company were authorized to close the gates through which the plaintiffs drew off the water, until it was raised to the height of the dam.)

That upon the faith of these agreements the plaintiffs had expended in the erection of the dam, machinery, &c., to supply the city and adjoining districts with water, upwards of $1,000,000.

2 G

And that under the authority of acts of Assembly they had con-tracted with the two corporations, defendants, to supply their inhabitants with water, and had complied with their agreements; but that the defendants had employed workmen, collected materials, and were about erecting buildings and machinery to take and use the water and water-power of and from the pool formed by the dam erected at Fairmount. That the act of 1843, under which they pretended a right, gave no such authority, because of the clause saving all the rights of the Schuylkill Navigation Company, and because no act could authorize the taking and use of the water without the plaintiffs' consent, since it would be a violation of the 10th section of the constitution.

The answer of the defendants alleged, that by the acts of 1769 and 1771, commissioners for paving and cleansing the streets of the city and the corporation of the wardens were created, who were autho-rized to erect new pumps and purchase old ones for the use of the public, and authority was given to assess taxes for that expense; and that in 1789 and 1790 this authority of these bodies had been transferred to the government of the city, which was authorized to levy the taxes and to regulate the time, order, and manner of light-ing, watering, &c., the streets, &c.; that in 1792 the corporation of the Delaware and Schuylkill Canal Company were authorized to supply the inhabitants of the city with water, and that an attempt was made by the city, in 1798, to contract with that cor-poration for that purpose, but it was abandoned; that in 1799, works were erected by the plaintiffs on their own property, by means of which water was drawn from the river by pipes laid on their own property or under the streets to supply the residents within the city limits, and this method continued until 1815, when the steam-works at Fairmount were completed; that the reservation in the legislative grant to Kennedy only related to the conducting of the water to the city, and was within the control of the legislature, and required further legislative action to make it operative for the bene-fit of the city, and was repealed by subsequent acts; that the act relating to the Schuylkill Navigation Company reserved the rights of the Schuylkill and Susquehanna Navigation Company, of the Delaware and Schuylkill Navigation Company, and of the Union Canal Company; and in case of forfeiture of the rights of the Schuylkill Navigation Company, reserved the rights of their grantees of the water-power who were to keep up the dams con-nected with such water-power on the terms mentioned in the act; that the Schuylkill is a navigable river; and that the tide ebbed and

flowed up to the lower falls in its natural state, and the Commonwealth was the owner of the soil and of the river, of which the water was common to all for navigation, fishing, washing, drinking, and the necessary purposes of supporting life; and that it was. a public common to which any citizen of Pennsylvania had an equal right.

That by the act of 1815, the Navigation Company had no authority to divert the water of the river permanently, but it must always be returned into the natural channel, above the lowest point to which the privilege of the company extended, and that the soil and river remained in the state, subject to that franchise, and the water continued common to all for fishing, drinking, &c., subject to necessary regulations; and as the Navigation Company had no call to use the water for fishing, drinking, washing, or other necessary purposes of life, neither the power to do so, nor the power to prohibit others entitled to such rights by the common law of the land was vested in them, by the said act of incorporation; that the water-power incidentally created by the dams would have remained dormant but for the special authority given to use the same, which gave no additional power over the water of the river as to its exclusive use, but it remains subject to the franchise of the company and to the prior rights of navigation, fishing, washing, drinking, &c., common to all the citizens of Pennsylvania, and that the authority to sell was subject to the same rights as if the company had retained the water-power; and that the company could not grant the right of permanently diverting the water by pipes, &c.

The defendants further alleged, that by the contracts with the plaintiffs, the defendants are charged fifty per cent. more for the use of the water than is paid by the residents within the city, and that portions of the district of Spring Garden, by reason of its elevation, cannot be supplied by the Fairmount reservoir; and that the city councils, in 1843, declared it was not their duty to supply such parts. Labouring under these disadvantages, they had applied to the legislature for permission to draw water from the Schuylkill, by means of steam-works, which was opposed in a memorial by the plaintiffs, claiming an exclusive right under the contract with the Navigation Company, on which the committee of the legislature reported, it would neither be an infringment of vested rights, a breach of contract, or a disregard of prior legislative enactments; that on the 18th April, 1843, the defendants were authorized to erect works on or adjacent to the river Schuylkill, at any place between the south line of Coates street and the northern boundary

of the district of Spring Garden, or in such other suitable location as they may deem expedient, for the purpose of supplying their inhabitants with water from said river, or such other stream of water in the vicinity of said districts as might be found practicable, provided no more water was taken than was necessary for affording such a supply. It was further provided, nothing in this act should be so construed as to impair any grant theretofore made by the Commonwealth to the Schuylkill Navigation Company, and also that the act should not go into effect, if within three months the plaintiffs should reduce the water-rents of the districts to the same rates as are charged to the citizens of the city. This last condition not having been complied with by the plaintiffs, the defendants had commenced the erection of steam-works to pump water from a place within the bounds allowed by the act of Assembly, and where the tide ebbed and flowed when the river was in its natural state. (This was in the pool created by the plaintiff's dam at Fairmount.) That the daily consumption of the districts was estimated at fifteen hundred thousand gallons, and the capacity of the steam-works was thought to be twenty-five hundred thousand gallons. They then set forth an account of the expense they had been at, and averred that the capital invested by the city in the water-works did not exceed $850,000, and that it had been repaid by the water-rents; and also averred that they would not use or divert any water or water-power belonging to the plaintiffs.

The evidence read and relied on at the hearing of this appeal, on the part of the plaintiffs, was, their title proved as set forth in the bill; negotiations between the plaintiffs and defendants, after the period allowed by the act of 1843, in which plaintiffs offered to reduce the water-rents of the districts to the city rates, and to remunerate them for the expenses they had already been at, and to supply the elevated portions of the districts from the reservoirs by them erected; the resolution of the defendants, that, having confidence in the estimates of their commissioners, that the works would yield a *large profit* to the districts, and that water would be afforded to their citizens at as low, if not lower, rates than were offered by the city—all further negotiations were deemed unnecessary.

The defendants gave evidence, that the elevation of about one-third of the district of Spring Garden was too great to be supplied from Fairmount. They also relied on the act of 1846, which provides that no courts in Philadelphia county shall exercise the power of a court of chancery, in granting or continuing injunctions against the use of any public works of any kind, erected or in progress of

erection, under the authority of an act of the legislature, until the question of title and damages shall be submitted and finally decided by a common-law court.

His honour, in ordering the injunction, said,—with reference to the title of the complainants to the exclusive use of the *water*,—after stating the general rule as to the rights of riparian owners of private streams, and that, though a public highway, the state could not in such case divert the water to injure the owners of the soil—"But in the case under consideration the state owned the bed of the river at Fairmount dam, and far above it, and, according to the principles already laid down, could originally have granted to any individual, or number of individuals, the exclusive right to navigate said river, which would have been the greatest privation to the public, in contemplation of law, at least, that can well be imagined; and if so, it cannot be questioned that she may grant the whole use of the water for propelling machinery and putting manufactories into operation, or for supplying the citizens of Philadelphia with water for drinking, washing, and for all culinary purposes, reserving to the public a sufficient portion thereof for all the purposes of navigation. It is objected, however, that the state did not grant the water of the Schuylkill river, or any portion thereof, *eo nomine,* at the Fairmount dam, to the Schuylkill Navigation Company, and, consequently, that company could pass no such right to the complainants. This objection is certainly more specious than solid. For all the water-power there is granted to the company in express terms, which indeed is not denied: but where is the water-power to be obtained from, if the water be taken out of the Fairmount dam by the defendants, excepting what may be necessary for navigation? Is it not self-evident, that the right of the complainants to all the water-power, with which they are clearly invested, at the falls of the Schuylkill and the Fairmount dam, must thereby be rendered useless, if not real. It would, in effect, be depriving them of that to which they are justly and fairly entitled, in direct violation of all right.

"And as regards the right of the complainants, it can make no difference to them, whether the water of the river be taken from them by drawing it off at the breast of the Fairmount dam, where all the power of the whole body of the stream is concentrated, or taken out at any point above the breast of the dam, so as to deprive them of the water-power that they otherwise would necessarily have. Their right would be affected, and the injury done to them be equally great in the one case as in the other. Seeing then that

the complainants have become invested with a right to the water of the Schuylkill river at the falls and the Fairmount dam, for the purpose of having all the water-power that may be derived therefrom, to be used or sold by them at pleasure, provided it be used in such a manner as not to interrupt or injure the navigation of the river, it follows, necessarily, that a right to draw off the water of the Schuylkill in any quantity from that point of the river, for the purpose of supplying the citizens of the city of Philadelphia, or those of any other place, in all their wants of water, could only consistently with the prior grant be given by the state to the complainants, and to no others, without their consent. Such additional grant to the complainants would accord perfectly with the right to all the water-power of the water of the river previously granted after it became vested in them, and would enable them to apply the water of the river to either purpose, in such proportions as the exigency of the time being and the occasion seemed to require."

*J. M. Read*, for appellants.—The title set up by the city is under the grants to Kennedy and the Navigation Company; it cannot be larger than they were. The former is a mere grant of the use of part of the *water-power;* and in the very ample privileges bestowed upon the company, there is a careful avoidance of a grant of the *corpus* of the water. Two distinct rights are granted, both of which would have been included in a grant of the water—the exclusive right of navigation, and the right of selling the water-power, incidentally created by the improvements for the former purpose. The rights of grantees of the latter are cautiously preserved in the event of a forfeiture by the corporation, thus showing a distinct understanding of the separate and distinct character of the two rights from each other, and from the ownership of the water of the river. In the grant by the company in 1824, words of larger import are used than in the prior grants; there *water* as distinct from water-power is granted, with the privilege of vending it to the adjoining districts. But the company, not owning the water under their charter, had no such right as they granted; it remained as before, common to the use of the riparian owners and citizens of the state. There are three uses of water known to the law: drinking, washing, and the other ordinary purposes of life; 2, water-power for manufacturing purposes; 3, navigation. In Mason *v.* Hill, 5 Barn. & Ad. 1, Lord Denman lays it down as a rule, common to the law of England and the civil law, that running water is common to all. The same principle is laid down, *arguendo*, in

Shrunk v. Navigation Company, 14 Serg. & Rawle, 71: "the river is common;" so are the fisheries in this river: Carson v. Blazer, 2 Binn. 475, 495; Bird v. Smith, 8 Watts, 434; Shultz on Acq. Rights, 68; 24 L. L. In Martin v. Waddell, 16 Peters, 367, the question arose between the proprietaries and the state; and it was held that the water of the rivers, and the soil under them, remained in the state. In Arnold v. Mundy, 1 Halst. 1, 61, 71, 76, it is said that, by the law of nature, navigable streams are common to all, subject only to laws regulating their use, and cannot be aliened. So it is with the public squares, the right to use which is in all the citizens of the state, though the title is in the city: Commonwealth v. Alburger, 1 Whart. 487. The capacity of the legislature to make such an exclusive grant is. denied. It was denied, with respect to streets, by McLane, J., in New Orleans v. United States, 10 Peters, 720; and also in Commissioners v. Kempshall, 26 Wend. 413. The right to this *exclusive* use must arise, if it can at all, by grant, for being declared a public highway by the act of 1803, (4 Smith, 20,) as it was by our common law, there can be no other mode of acquiring it. The settled rule of construction is against an enlargement; the strictest interpretation is always adopted, to avoid any infringement of the higher common right: Bacon v. Arthur, 4 Watts, 437; Mononghahela v. Coons, 6 Watts & Serg. 101; Act 1841, p. 345. This has always been the rule for construing grants by the sovereign. The distinction between water-power and water is recognised legally in Commonwealth v. Church, 1 Barr, 105, and is known in every day's experience; the power is the momentum of the stream, or weight of the body of water when in the stream, and the right to this does not exclude other rights, or give any authority to remove the water from the stream: Pettee v. Hawes, 13 Pick. 323; Speigelmoyer v. Walter, 3 Watts & Serg. 540; Schuylkill Navigation v. Moore, 2 Whart. 477; Schuylkill Navigation v. Farr, 4 Watts & Serg. 362; Schuylkill Navigation v. Freedley, 6 Whart. 109; Zimmerman v. Union Canal, 1 Watts & Serg. 353; Tyler v. Wilkinson, 4 Mason, 397; Blanchard v. Baker, 8 Greenl. 266; Webb v. Manufacturing Company, 3 Sum. 201; Parker v. Cutler, 7 Shep. 357; French v. Camp, 6 Shep. 433; Boston v. Railroad, 23 Pick. 360; Commonwealth v. Shaw, 14 Serg. & Rawle, 9; Ingersoll's Tract, p. 9; Susquehanna Canal v. Wright, 9 Watts & Serg. 9.

This subject was carefully examined in the legislature, and their report (p. 2) is in accordance with the views here contended for.

This legislature having retained all that had not been granted, have given the respondents the right to draw this water; the power used is steam; not the water-power vested in the city, of which we take none. And they complain, when they are devoid of all authority to erect the works to which the alleged injury is committed. [*Per Curiam.*—The want of right to erect the works by the city cannot affect their title; the whole question depends on the charter of the Navigation Company, and their grant to the city.] The injury to their right is imperceptible, since not nearly all the waste-water is used. Indeed, there is a saving, since, to raise the quantity required by the districts, there is an expenditure of thirty times as much to obtain the power to raise it to the reservoirs.

The act of 1846 alone remains for consideration. The complainants ask the extraordinary powers of this court to be exercised on their behalf; the legislature have, by the act of 1846, put the county of Philadelphia, in a measure, in the situation of the rest of the state, and merely require an establishment of title prior to the injunction. Such is, doubtless, within the power of the legislature: 9 Watts & Serg. 9; Pollard *v.* Hagan, 3 How. S. C. 212; U. S. *v.* New Bedford, 1 W. & Minot, 401.

*Olmstead*, for appellees.—The question is one of property merely,—whether the legislature granted to the company the right to sell the surplus water, and whether they did sell it to the city, and if so, can any one else take it? It is not whether the inhabitants may use the water for washing and drinking; for the defendants claim no such privilege, but a right to erect machinery driven by any power to raise the water for sale to any one for any purpose. They claim the right to sell the water thus raised for manufacturing purposes, as the report of their water commissioners since this injunction shows they have done—a large portion of their rents being derived from breweries, water-wheels, &c. The history of the causes of controversy is brief. After much expenditure by the city in the preliminary attempts to obtain a supply of water, the present works were finished. In contracting with the districts, it was thought reasonable that an increased payment should be made by them to pay a portion of the debt incurred before the present works were erected, and thus equalized the expense. It was considered that the act of 1843, under the construction contended for, was an illegal interference with vested rights, and that it would be improper to make a concession under such compulsion.

When the period had elapsed, the defendants declined to accept the proffered concession.

The title of the city to the water is derived through the legislative grants to Kennedy and the Navigation Company. The consideration we have paid is $150,000 to the former, and to the latter the cost of the dam, &c., the expenses of repairs, damages, and $26,000.

It is now said the state could not grant the water to the company. But the doctrine of this court is, that the Commonwealth is the despotic owner of navigable streams, both of the soil and the water, and that there is no riparian ownership, or any right whatever, beyond low water-mark : Carson v. Blazer, 2 Binn. 475; Commonwealth v. Fisher, 1 Penna. Rep. 465; Shrunk v. The Navigation Company, 14 Serg. & Rawle, 71; 1 Smith, 235; 10 Serg. & Rawle, 234; Bird v. Smith, 8 Watts, 434; Zimmerman v. Canal Company, 1 Watts & Serg. 346; Lehigh v. Lehigh, 4 Rawle, 9; Philadelphia v. Trenton Railroad, 6 Whart. 44; Ball v. Slack, 2 Whart. 539; Ueberoth v. Lehigh, 7 Haz. Reg. 292; Baron v. Arthur, 4 Watts, 439; Atkinson v. Savage, 14 Haz. Reg. 10; Wilson v. Black, 2 Peters, 245; Merritt v. Parker, Coxe, 460.

That the legislature designed to grant the water to the company, is apparent, for they are to use or grant the water-power subject to but one restriction, viz. that the navigation shall not be impeded. The mere use of water-power in the stream could not, in any event, affect the navigation; and, as is shown by Mr. J. Kennedy, the water-power cannot exist without the water : Tyler v. Wilkinson, 4 Mason, 397. If this be not so, the city is in a worse position by its purchases than the defendants, for the Navigation Company may cut off our supply, which they have not the means of doing in the other case.

But the defendants rely on the authority given by the act of 1843. In the proviso of that act is a saving of all the rights granted to the Navigation Company; and, since the act not only authorizes the taking of the water for the purpose of drinking, &c., but also the use of the power which, it is conceded, had been absolutely disposed of, the interpretation of the act must be that the river Schuylkill is excepted, so far as the exercise of the authority would be incompatible with the prior grant. Such is the established effect of a proviso : Commissioners v. Keith, 2 Barr, 219; and the intent was to leave to the courts to decide what would, or would not, be in derogation of the legislative contracts.

*Meredith*, on the same side.—The object of this suit is not merely the redress of an injury, but to determine whether the city, after the immense expenditure incurred, has acquired any right, and if so, whether it may be continually invaded until it is driven to some other place, or means, for obtaining this necessary of life. In the dealings with the Navigation Company and Kennedy, their *claims* were respected, and we exercise our rights under laws and grants which have been paid for. The points to establish the right and sustain the decree, are five: 1. Under the acts of Assembly and grants, the city has a right. 2. Those acts and grants are lawful, and do confer what they purport to confer. 3. They have been violated. 4. The excuses. 5. The objections to the remedy.

1. The act of 1815 expressly granted all the water-power of the river, and the city purchased from the company all the surplus after the necessities of the navigation were supplied. It is confined to this surplus, and the moment a surplus ceases to exist our gates are closed. What title can be stronger. It is more direct than a patent. But, it is said, the *water-power* only is conveyed. What are those words but a definition of the thing? The power is created by the water, and it is the right to use all the surplus water of the river to drive machinery or water wheels that was purchased. Take away the water, and where is the power? And is not the water taken by the defendants? and is not the water-power belonging to the plaintiffs by so much diminished?

2. It was said the power of the legislature would not be denied; but the invalidity of the acts, if against natural right, was the substance of the argument. And because the elements are necessary to life, and water is an element, it is said to be against natural right to allow an exclusive property in it. But, though all the elements are necessary, civil society regulates by laws the common or natural rights, and among these the use of the elements. The paramount use of streams, navigable either naturally or artificially, is for highways; they are included within the same species of property, and are regulated by the same class of laws. Any infringement upon that use is a wrong. It is true, that Lord Denman, in Mason *v.* Hill, referring to the Institutes, says that running water is not the subject of private property; but Domat, in the general classification, Liv. Prelim. tit. 3, s. 1, p. 16, among those things which are common to all, enumerates the heavens, stars, light, air, and sea; while rivers, streams, banks of rivers, highways, are classed among *publicæ*, of which the sovereign regulates the use. Thus, without hesitation, he places rivers in the same category as highways.

This must be the law in all countries. Fleta, book 3, c. 1, s. 4, in treating of the use of things which are common, omits from them *aqua profluens;* and Nicasius, lib. 2, tit. 1, 89 b, commenting on the Institutes, reads *aqua pluvialis* for *profluens,* as among the common rights; while immediately afterwards he speaks of things public, among which are included *flumina.* In the Dig., book 43, tit. 12, s. 1, is laid down the mode of distinguishing rivers; and, in s. 22, "no man can be hindered from taking water from a public river, unless the sovereign forbids." But public rivers are again divided into two classes, navigable and not navigable. In the latter, the right to draw water exists until forbidden; in the former, none can be taken *until an authority is given:* Tit. 13, s. 9. So, in book 2, tit. 1, there is a provision entirely inconsistent with the supposition that running water, air, and light, are in the same category. This is then a public navigable river, and, by the words of the Digest, no right exists to take the water until it is granted. In Hale de Jure, Maris. c. 3, where the rights are spoken of, it is said no one can use a ferry for livelihood, unless by prescription or grant; and, as soon as the capacity of navigating exists, the public right comes in, for then they are public highways: Ibid. But, whether classed as common or public, the same right exists in the sovereign to regulate the use within his dominions.

3. That our rights are violated, cannot be doubted. The purpose for which they intend drawing water, is immaterial, nor does the act confine the use to domestic purposes, and that they do now use it for other purposes will not be denied. Would this be lawful in a private stream? Many of them it would entirely drain; and this river was the private property of the state, and is granted to us. All the answer attempted is, you have water-power, and we are taking water only. It is difficult to understand on what it is they base their right. If on the natural right, does that extend to the water in their basin? If not, because of labour expended in getting it there? We have also expended labour and money in making a surplus beyond the necessities of the navigation, and that is all we own. The legislature have expressly recognised this as a right in the act of 1826, s. 9, p. 304, by prohibiting the drawing of water from any pool of any navigation company without leave from the directors.

4. They justify under the act of 1843; but that prohibits this very work, as is apparent when its object is considered. It was intended to give a corporate capacity to construct works for supplying water to the districts. The means for doing this were to be

obtained in the usual manner, that is, purchase, when vested rights were to be infringed upon. The authority to take the water of the Wissahickon, which the evidence also shows was once in contemplation, is a proof of this. That is a private stream, entirely applied to manufacturing. If taken by the districts, it would have been drained and the mills destroyed. Certainly this would not have been allowed without compensation, any more than the authority to erect a court-house would authorize the confiscation of a lot convenient for the purpose. The right to use the Schuylkill and the Wissahickon being then given by the same words, is under the same implied restriction—that private rights are not to be infringed upon unless purchased from the owners. They also deny our right, that has been given by the charter and recognised by numerous acts of Assembly: Charter Preamb., 2 Sm. 462; Act 1790, Ibid. 526; 1813, 6 Sm. 22; 1820, 7 Sm. 272; 1828–1829, p. 44; 1831–1832, p. 55, 188. The capacity of the city to take is decided in The Mayor *v.* Elliott, 3 Rawle, 170; and the acts of Assembly authorizing contracts with the districts are also confirmatory. They also allege the injustice of the higher prices demanded of them. But at whose risk are the works? Who is to renew the dam if swept away by a flood? The real reason is to be found in their own resolution. "The districts will make a profit." The precise extent of the damage is, of course, immaterial, (Moore *v.* Schuylkill Navigation Co.,) since it is clearly not nominal; but the principle involved is vastly important, being none other than the right of private property.

5. The act of 1846, it is said, prevents the court granting this remedy. That the legislature may exercise judicial functions so far as to grant a new trial, as in Braddee *v.* Brownfield, 2 Watts & Serg. 271, is not denied; but certainly they cannot direct the determination of a cause in a particular way. Here we have a final decree establishing our right, and this is the method of enforcing it. We ask merely a dismissal of the appeal, not a continuance of the injunction; it will continue itself. It is the complainants who ask a change in the decree, which this court cannot grant but according to its own judgment of the right.

There is a better answer than this. The appellants are not included within the act, for their works are not *public* works, but the private property of their corporations. The meaning of "public works" is more important, because the right of eminent domain is limited thereby. The civil law divides property into five classes: *communia, publica, universitatis, nullius,* and *singulorum.* In the

first are included the sea, air, and light, for all may use them, subject to laws of the particular countries. *Publica* includes property of which the dominion is in the state for the use of *all* the people of the state, subject to laws in like manner. *Universitatis,* or a corporation, includes all bodies of men less than a state and greater than a family. Things *universitatis* are those of which all the *community*, or members of the corporation, have the use, as baths, race-courses, *curiæ :* Heinec. on Inst., book 2, tit. 1, s. 15. These purposes are not such for which private property may be taken by the right of eminent domain. That is defined in Prelec. Puffend. to be the power of the state which authorizes private property to be used so often as *public* necessity requires. Works similar to these of the appellants were enjoined by Kent, Ch., in Gardner *v.* Newburg, 2 Johns. C. R. 162, while the right to take for *public* uses was not denied. The subject is further considered in 2 Kent's Com. 339 ; Grot. book 1, c. 1, s. 6 ; Puffend. book 8, c. 5, s. 7. Otherwise every borough might confiscate private property for its own use. The question then comes down to this : Is there such a thing as private property, and are men to be protected under their grants ?

*Dallas*, in reply.—It is difficult to answer an argument shifting as this has done, denying at one time the power of the legislature ; at another, asserting its omnipotence, strictly defining public rights, and again declaring such rights are unknown, or incapable of definition or enforcement. But the acts of the legislature for the city and for the districts are all capable of reconcilement. Four propositions will be maintained : 1. The Commonwealth could not convey, by perpetual and irrevocable grant, the waters of the Schuylkill, so as to exclude its use for common and necessary purposes, and convert it into private property. 2. If it could, it has not. 3. Either of these being established, the acts of the districts are justified either as a common right or as an expressly authorized public right. 4. The act of 1846, independent of all these, opposes an insuperable bar to the injunction.

1. The incapacity to grant the water, to the exclusion of the use by the people, lies at the bottom of all natural and indefeasible rights springing from physical necessity, which is superior to all improvements, comforts, or conveniences. This has never been denied but in barbarous countries. But these natural rights springing from necessity are always protected where man as an individual is regarded, and can only be forfeited by crime. This

incapacity of alienation by the state of these common rights is expressly recognised by a learned judge in 1 Halst. 76, the legal title and usufruct being vested in the people of the state.    Among these common rights, are placed *flowing water* that men may drink : Instit. book 2, tit. 1, s. 1 ; Grot. book, c. 2, s. 12 ; so in Puff. book 4, c. 5, s. 2, running water remains in common; and by Vattel, book 1, c. 20, p. 101, 110, it is classed among those things which, in their own nature, cannot be possessed.    So in Browne's Civil Law, book 2, c. 1, p. 170; Brac. book 2, fol. 7, and Vinnius, 140, 141, 142, it is declared that the use of the water of rivers for washing, drinking and for cattle, is common for the use of all, and of natural right.    The difference of regal and public rights are indifferent here, for both are, as said in 26 Wend. 413, vested in the same power, and for what ?    To be destroyed?    No, but to effectuate the right.    The very next sentence of Fleta, following the one cited on the other side, ranks among these common rights the right of using streams and harbours.    Not an authority but shows this power of the state has always been exercised to promote this general right of the citizens, never to diminish it.    Would the grant of the exclusive navigation of the Susquehanna to one individual be tolerated, or the exclusive right of drinking from the Schuylkill, if given to but one family of the town ?    Yet to such length must the argument be carried if it be sound.

2. The legislature have not granted the exclusive right.    Prior to 1815, the city supplied itself with water under the common right.    The water-power was then purchased; but the distinction between water and water-power is settled by the undisputed rule that the owner of a water-power in a private stream cannot divert the water from the channel, unless he returns it on his own land.    This common right was recognised in the acts of 1761, 1 Sm. 235; 1773, Ibid. 410; 1781, Ibid. 515; 1784, 2 Sm. 90 ; and the acts of 1843, 1844, are legislative constructions of the act of 1815.    The habits and usages of the people show this, and they are good grounds of construction of a statute : Martin *v.* Waddell, 16 Peters, 367.    The claim set up would deprive every inhabitant along the river from drawing a cup of water from the stream, since by so much is the water-power diminished.

3. We have shown an express grant ; and, if this were not so, it has been shown that the common right is not extinguishable by a legislative grant as private property.

4. It is said this is not a public work.    But, in common parlance, it certainly is, and by that rule the meaning of the legisla-

ture is to be determined. It is like penitentiaries, jails, alms-houses, court-houses, &c., which are always called public buildings, and considered public works. The object of the legislature was to give the determination of the title to a common-law court, know-ing that damages could not be recovered, since it can be demon-strated there is an actual saving produced by the defendants' works.

GIBSON, C. J.—Notwithstanding the range which the argument has taken, the ground of this controversy lies in a narrow space. Instead of depending on general or constitutional law, the question before us depends on the interpretation of a short and isolated sec-tion of a statute; but the quotations from the civilians and from Lord Hale bear strongly upon it. They establish that the use of water, flowing in its natural channel, like the use of heat, light, or air, has been held by every civilized nation, from the earliest times, to be common by the law of nature, and not merely public, like the use of a river or a port, which is subject to municipal regulation by the law of the place. They establish, also, that the domestic uses of water are its natural and primary ones. Air is not more indispensable to the support of animal or vegetable life. Water is borne by the air, in the form of vapour, to the remotest regions of the earth, for the free use and common refreshment of mankind; and to interdict the use of the one within any particular locality, would be as monstrous and subversive of the scheme of animal existence, as it would be to interdict the use of the other. It is only when it has been received on the surface of the earth, not while it is falling from the clouds, that it can be made to minister to the ordinary wants of life; and if it be common at first, it must continue to be so while it is returning, by its natural channels, to the ocean. No one, therefore, can have an exclusive right to the aggregated drops that compose the masses thus flowing, without contravening one of the most peremptory laws of nature. Water may be exclusively appropriated by being separated from the mass of the stream, and confined in tanks or trunks; but then it would have ceased to be *aqua profluens.* It does not cease to be so, how-ever, by being merely impeded in its natural channel by a dam. That a law of nature may be displaced by even legislative might, has been stoutly denied by high authority, though perhaps without conclusive effect where the question is one of power and not of right; but where a court has to deal with a question of construc-tion and not of power, the protection of such a right from violation

by superior force, must always turn the scale. Nothing but the most clear and imperative expression of the legislative will could prevent it. What we have to do, then, is to see whether the legislature has undisputably debarred all mankind from drawing water from the Schuylkill river, except by permission of the Schuylkill Navigation Company, or the city of Philadelphia, its alienee.

The city claims, not immediately by grant from the Commonwealth, but by conveyance from the company, which can pass no more than the company had power to give. The fifteenth section of the act of incorporation provides, that "the said president, managers and company, shall have the privilege, and be entitled to use, the water-power from the said river, sluices, or canals, to propel such machinery as they may think proper to erect on the land, which they may previously have purchased from the owner or owners; or may sell in fee-simple, lease, or rent, for one or more years, the said water-power, to any person or persons, to be used in such manner and on such terms as they may think proper:" with condition that the consequences of the grant shall not at any time impede the navigation. Nothing contained in any subsequent enactment touches the subject of water-power, except a proviso subjoined to the twenty-fifth section of the same act, which declares "that in case of forfeiture by the company, the owners of water-power created by any dam erected by virtue of this act, shall be obliged to keep in perfect repair and good condition, any dams, slopes, or locks, connected with such water-power, under and subject to the same conditions and penalties as the company originally were; and shall have a right to charge and receive the same tolls as the company are authorized to receive by this act: and in case the owner or owners of such water-power shall neglect or refuse to keep such dams, slopes, or locks, as aforesaid, in good repair, fit for the passage of boats, arks, and rafts, as the case may be, the legislature may resume all the rights, privileges, liberties, and franchises granted by this act." I have extracted the proviso entire, not only to present all the legislation on the subject to the eye at once, but to show that the question before us depends exclusively on the fifteenth section.

Now, a grant of water-power is not a grant of the water for any thing else than the propulsion of machinery; and it consequently does not exclude the use of it by any one else, in a way which does not injure or decrease the power. It is not a grant of property in the *corpus* of the water as a chattel; and this does not seem to have been doubted by the judge who decided the cause below. A right

may doubtless be granted, if a grant were necessary, to intercept running water, and confine it in reservoirs for separate use; but the grant of such a right would not be the grant of a water-power. No two things can be more distinct and dissimilar. The respondents, therefore, would not be answerable in equity for taking the free and running water of the river, or for any thing less than a nuisance to the complainants by decreasing the volume and force of the current; for on no other ground could the extraordinary jurisdiction of a chancellor, which in cases of nuisance is only the handmaid and protectress of the legal title, be invoked to restrain the diverting of a water-course. The authorities to the point are collected in Eden on Injunctions, c. 11, p. 157, in which it is shown that, though it is the practice to enjoin in clear cases of nuisance, without a trial to establish the right at law, yet the courts of equity are exceedingly unwilling to do so; and my first impression was *that the* injunction ought to have been refused on that ground. But granting for the occasion that the bill, answer, and proofs, establish the existence of an actual nuisance, yet, as injunctions, without exception, are discretionary and grantable on the circumstances of the particular case, I am far from clear that it would not be our duty to leave the complainants to their remedy at law, until they could make out a case of substantial and appreciable injury to a part of their water-power, which they otherwise would have put in use: and no such injury is made out by the proofs. The estimates are that about two millions of gallons are daily taken by the respondents from the pool, while from one hundred and fifty to five hundred millions are suffered, in the same time, to tumble over the dam. Whatever, therefore, may be the growth of the districts and their wants, it is pretty certain that the complainants will be free from actual damage from the respondents' works, in all time to come. The number of the population at present is computed to be one hundred thousand; and should it in time be equal to the population of London and its environs—a thing that is barely within the bounds of possibility—the daily consumption, according to the present ratio, would be no more than forty millions of gallons; leaving an immense surplus, which the complainants do not, and probably never can, use: but should the case turn out in process of time to be otherwise, it would be time enough to apply the strong arm of a chancellor to it. But according to Pastorius *v.* Fisher, 1 Rawle, 27, a plaintiff is entitled to nominal damages from one who floods his land without actual damage, because every invasion of a right is, in contemplation of

law, a constructive damage, calling for compensation in proportion to its importance. We must not forget, however, that an action is of right, and that an injunction is of grace. Viewing the case as if the complainants had established their right by a verdict at law, it would not follow that a subsequent jury, performing the office of a chancellor under our mixed system, as necessity has sometimes compelled them to do, would be bound on the principle of Clyde v. Clyde, 1 Yeates, 92, to coerce the respondents, by means of vindicatory damages, to abate their works; and if a jury would not do so, a chancellor would not enjoin them. It is true that in an action to compensate a benefit, the value of it to the receiver is the measure of the damages ; but when the action is for a wrong, the measure is compensation to the extent of the loss. But no speculative benefit or loss is a subject of compensation; and even if it were, yet where damages will compensate either the benefit derived, or the loss suffered, from a nuisance, equity will not interfere. Here the complainants might recover full compensation, by a verdict for the one or the other, inasmuch as the works above do not practically interfere with their comfort or convenience. We must admit that a man who has paid for a water-power is not bound to use the whole, or any part of it, but that he may choose to let the water escape, as the complainants did, without giving any one a right to interfere with it ; but would not non-user be a matter to go to a jury, in mitigation of damages ? Except to establish the right, a jury is not at liberty to go beyond the actual loss ; and this principle is peculiarly applicable to the course of a chancellor. I have found no case in point for diverting water-courses ; but conclusive analogies may be drawn from cases of nuisance, by stopping ancient lights. In the Attorney-General v. Nichol, 16 Ves. 338, it was held that equity will not interfere where the injury can be compensated by damages; but that it will restrain an injury which would probably drive the complainants from the premises. No fear of that, from any injury done to the complainants before us. Lord Eldon said that the foundation of equitable jurisdiction to interfere by injunction in cases of nuisance, is that head of mischief alluded to by Lord Hardwicke, in The Fishmongers' Company v. The East India Company, 1 Dickens, 164, as that sort of *material* injury to the comfort of the existence of those who dwell in the neighbouring house ; that the diminution of the value of the premises, is not a ground to interfere ; and that equity will not interfere upon every degree of darkening ancient lights. And in the kindred case of Lord Ripon v. Hobart, 3 Myln. & K. 169. Lord Brougham re-

fused an injunction to prevent a contingent nuisance, saying that "if the thing sought to be prohibited is in itself a nuisance, the court will interfere to stay *irreparable* mischief, without waiting for the result of a trial; and will, according to circumstances, direct an issue or allow an action; or, if need be, expedite the proceedings, the injunction being in the mean time continued. But where the thing sought to be restrained is not unavoidably in itself noxious, but something which may, according to circumstances, prove so, the court will not interfere. So in Wynstanley *v.* Lee, 2 Swanst. 333, Sir Thomas Plumer refused an injunction to restrain the erection of a building which darkened ancient lights, because it did not appear that it would materially interfere with the comfort of the complainant. I do not, however, insist on this aspect of the case, because it is not one in which it was viewed at the argument, or one which has attracted the attention or elicited the opinion of my brethren; and emphatically because there is another ground on which we all agree that the decision may be securely rested.

The preceding remarks have been hazarded on the foot of a momentary concession that the respondents' works are a nuisance in contemplation of law; but are they so? The affirmative must be rested on an assumption that any abstraction of the water for domestic purposes is a technical injury to the complainants' waterpower; and this, whether it were drawn from the pool or from the stream above; for the volume of the water would be equally lessened by it in either case. According to the argument, it would be an infringement of the company's right, to draw water from the river even above the charter-ground. But is it possible to think, that in granting the company authority to use or sell the power of the surplus water, the legislature intended to appropriate the whole stream, for every purpose, to its exclusive use, and to debar the inhabitants of the contiguous villages and farms from using any part of it for drinking, cooking, washing, or any other domestic purpose? It would be monstrous to suppose it. The very extravagance of the pretension is an irresistible argument against it. The intent of the legislature was to give the company a monopoly of the power incidentally created by its works, and to give it no more; for the words of the section go no further. The water in its pools was not to be drawn from them for application to machinery elsewhere without its consent; for that is the extent of the enactment, and it contains no express or implied prohibition of any other use of it. The river above the charter-ground was left subject to the common law, which allows every riparian owner to divert

the stream for purposes of irrigation or power, subject only to return the residue of it to its natural channel on his own ground; yet even he would be liable, on the principle of the argument, for the least imaginable diminution or consumption of it. Even within the extent of the charter-ground, there was to be no sacrifice of natural and inherent rights to the merely collateral creation of water-power, which was not the object for which the company was incorporated, but merely auxiliary to it. The legislature would not have ventured to abridge a right so sacred to accomplish a subordinate purpose, however meritorious; and had the interpretation attempted been propounded to it as necessary and inevitable, the bill would certainly have been rejected. What, then, have the respondents done? The inhabitants of the districts might have lawfully dipped from the margin of the pool, water enough for their several necessities; but instead of drawing it by hand or by horses, they have combined their funds to produce a cheaper and a better transportation. True, they have laid pipes in the pool, as they might have laid them in the bed of the river, had not the dam been erected; but what has that to do with the supposed production of an injury to the complainants by decreasing the volume and power of the stream? Certainly no more than the transportation of the water, when separated from the mass, has to do with it. Unless the complainants have a specific property in the water itself—and all the writers on natural or conventional law agree that they have not—they have no equity. To state their case is to decide it. We are therefore compelled to differ from the opinion expressed by our late brother Kennedy, and to reverse his decree.

Injunction dissolved and bill dismissed.