Marion Semple, Appellant, *v.* The Cleveland & Pittsburg Railroad Company and The Pennsylvania Company.

[Marked to be reported.]

| 172 | 369 |
| d208 | ¹ 32 |
| 172 | ⁻ 369 |
| 32 SC | ³ 99 |
| f 33 SC | ³575 |

*Railroads—Contract—Revocation of contract.*

A railroad company which entered into a contract with a landowner by which, in consideration of a right of way, the company agreed to employ the landowner and pay him a salary as station agent at a station to be built by the landowner on his own land, cannot revoke the contract in part by instituting proceedings to condemn the station lot, and at the same time retain the right of way, which was the main consideration for the contract. The contract is entire and must be performed or rescinded as a whole.

The railroad company must in such a case be required to elect whether it will pay for its right of way and other privileges as it agreed to, or by rescinding the contract and proceeding under the right of eminent domain.

*Railroads—Eminent domain—Approval of bond—Passing of title.*

While ordinarily the legal effect of the approval of a bond given by a railroad company in condemnation proceedings is to pass the title to the land or easement to which it relates, this effect does not necessarily follow where the entry of the railroad company is in clear violation of the covenants contained in a written contract with the landowner.

Where a railroad company institutes proceedings to condemn land, and such proceedings are in clear violation of a prior contract between the railroad company and the landowner, the landowner has a standing in equity to enjoin the proceedings until the covenants of the contract are performed, or the contract rescinded.

Argued Oct. 16, 1895. Appeal, No. 185, Oct. T., 1895, by plaintiff, from decree of C. P. Beaver Co., June T., 1891, No. 1, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. Reversed.

Bill in equity to restrain condemnation proceedings.

On May 22, 1856, Susan Smith and others, plaintiff's predecessors in title, entered into a written contract with the Cleveland & Pittsburg Railroad Company, by which in consideration of a right through their land for a distance of fourteen hundred feet, and land for a woodhouse and watertank, and water from a spring, the railroad company covenanted as follows:

VOL. CLXXII—24

" And the second party (railroad company) to these presents does hereby agree that the said first party shall erect and own their own station building at the place before named, and furnish a suitable room for the convenience of passengers at all times, free of charge, to be finished as soon as the road is finished, and the railroad company agrees to pay them the same price for receiving and delivering the property or freight, and money received for tickets, as they did at other stations on the road where the parties owned the station buildings. The second party does hereby agree not to erect a station nearer than East Liverpool on the west, or nearer than Industry on the east, except a way passenger station opposite what is called Christler's Landing. They also agree to keep up all such fences as may be necessary to protect the crops on both of said farms ; to make all necessary farm crossings ; to move such buildings as require to be moved, etc. ; . . . . and that this agreement may be a finality and perpetuated, it is hereby agreed upon by the said contracting parties to make it a matter of record in the record books of the county for recording deeds and mortgages."

In 1887 the Pennsylvania Company, which had leased the property of the Pittsburg & Cleveland Railroad Company, began condemnation proceedings to take the land upon which the station house had been built by the owners in accordance with the terms of the contract. The bill prayed for an injunction to restrain the condemnation proceedings. The eleventh and thirteenth paragraphs of the answer are as follows :

" 11. To the eleventh paragraph the defendants answer as follows : It is true that the Pennsylvania Company, lessee of and operating the Cleveland & Pittsburg Railroad, proceeded in the court of common pleas of Beaver county, at No. 200, June term, 1887, to condemn for the purposes of a station house the identical property upon which the said Jesse Smith had erected the station house in question, but not against the protest of Walton or Semple, as no protest was made by either of them.

" The condemnation proceedings were :

" First. April 14, 1887, written notice served personally on William Semple, that the land had been duly appropriated by the Pennsylvania Company, lessee of and operating the Cleveland

and Pittsburg Railroad, and that said company, being unable to agree with Semple for his damages, would, on April 19, 1887, at 10 o'clock A. M., present its petition to said court for the appointment of viewers to assess the damages, which petition was duly presented according to notice, and held by the court until the 21st day of the same month, when viewers were appointed, and May 17, 1887, fixed to meet on the land for the purpose of their appointment, of which meeting service of notice was accepted for William Semple by Hon. Henry Hice, his attorney.

"Viewers met at time fixed, performed their duties, and on June 6, 1887, their report was filed in court and confirmed nisi.

"July 5, 1887, William Semple appealed from the award of the viewers.

"This appeal was on the trial list at three terms of court, to wit: At March, September and November terms, 1888, and William Semple, by his said attorney, appeared at these terms of court, asked for and agreed to continuances; the last continuance, on November 12, 1888, being on account of the ill health of Mr. Semple.

"Second. In order to avoid the delay of the liquidation of the damages for the land appropriated, and to get possession thereof, on March 26, 1888, the said, the Pennsylvania Company, lessee of and operating the Cleveland & Pittsburg Railroad, tendered its bond in the sum of three thousand dollars, with three sufficient sureties, and in all respects in due form of law, to William Semple to secure his damages for the said land appropriated, which bond he refused to accept, whereupon, on the same day, the said Pennsylvania Company gave personal notice in writing to William Semple that said bond would be presented for approval and filing in said court, on April 2, 1888, at 10 o'clock A. M., and at the time fixed, the said bond was presented in open court, approved absolutely, and filed at No. 180, June term, 1888, without any protest, opposition or contest on the part of Mr. Semple. During the same month (April, 1888) the Pennsylvania Company took possession of the land appropriated, including the said station house, and, before the bringing of this suit, expended thereon, in repairs and improvements, more than four hundred dollars, and still holds possession thereof; and the defendants aver that such possession is lawful, the title

thereto having vested in the Pennsylvania Company in the exercise of its right of eminent domain, under the proceedings above set forth, and said company is ready and willing to pay to the proper party any damages that may be awarded as soon as the amount can be determined."

13. To the thirteenth paragraph the defendants answer:

" First. That the contract of May 22, 1856, and the several subsequent modifications thereof, were personal to the Smiths, without any power on their part to transfer their rights to strangers.

" Second. That said contract and modifications thereof did not run with the land.

" Third. That by the appropriation and condemnation proceedings, fully set forth in answer to the eleventh paragraph, the title to the land upon which the station house stands became vested in the Pennsylvania Company, lessee of and operating the Cleveland & Pittsburg Railroad, as against William Semple and the plaintiff who claims under him."

The case was referred to Louis E. Grim, Esq., as master, who reported in favor of dismissing the bill. Exceptions to the master's report were dismissed by the court and a decree was entered dismissing the bill in an opinion by WICKHAM, P. J., which was as follows:

By an agreement in writing, dated May 22, 1856, Susan Smith, Samuel Smith and Margaret, his wife, and Jesse Smith and Sarah, his wife, granted a right of way through their lands, in this county, to the Cleveland & Pittsburg Railroad Company.

The present controversy arises on the following covenants, which, with a number of others, formed the consideration of the agreement, to wit: " And the second party to these presents does hereby agree that the said first party " (meaning the Smiths) " shall erect and own their own station building at the place above named, and shall furnish a suitable room for the convenience of passengers, at all times free of charge, to be finished as soon as the road is finished. And the railroad company agrees to pay them the same price for receiving and delivering property or freight and money received for tickets as they do at other stations on their road where the parties own the station buildings. The second party does hereby

agree not to erect a station nearer than Liverpool on the west nor nearer than Industry on the east from the said Smith's station, except a way passenger station opposite what is called Christler's Landing."

The plaintiff claims to have succeeded to all the rights of the Smiths by virtue of judicial sales and private conveyances, and asks the court to specifically enforce the contract with the railroad company. While the bill avers, in a general way, a breach of the whole agreement, yet the plaintiff throughout the proceedings complained only of a violation of the covenants above quoted, and the controversy was limited entirely to these matters.

These covenants can only be explained on the theory that the infant company's necessities forced it to accept terms clearly contrary to public policy and subversive both of the rights of the corporation and of the public. It is surprising that such covenants were ever entered into. It would be still more surprising if a court could be found to specifically enforce them. It will hardly be contended that a contract, to last for all time, giving to any man, woman or child who may happen to own the Smith lands now or hereafter, the right, by virtue of such ownership, to act in person or by proxy as a conductor or engineer on the Cleveland & Pittsburg Railroad, would be treated seriously, by any court, on an application for specific performance. The same remark is hardly less applicable to a contract with one and his heirs and assigns to make him and them perpetual station agents.

The agent at a railway station is intrusted with duties of the highest responsibility. He flags trains, looks to the comfort and safety of waiting travelers, furnishes them with the complicated tickets which, perhaps, may carry them over a score of connecting railroads, and, in brief, guards, so far as his field of action extends, the lives and property of the traveling public.

No railroad corporation will be permitted to absolutely divest itself of the right and duty to select competent, and instantly dismiss incompetent or disobedient engineers, conductors and station masters. To hold otherwise would add to the perils of railway travel already numerous enough.

As an illustration of one of the results following the contract

under consideration, it may be mentioned that it was asserted at the argument, and is probably true, that the plaintiff here, who claims to be the de jure agent at Smith's Ferry, is an aged and feeble woman, and doubtless utterly incapable, even if willing, to perform in person the duties of a station agent. We are not informed by the bill, or the evidence, whom she proposes to put in charge of the railway business and interests at Smith's Ferry in case she succeeds in her suit. But, for that matter, she might have a new and untried person of either sex, or any age, every day in the year. The railroad company to whom, as said before, the law intrusts the duty of selecting competent employees, would have, practically, no voice in the matter.

The public interests involved in this litigation imperatively forbid the specific performance of the contract, so far as it may entitle the plaintiff to act as agent. The correctness of this view is so obvious that I have sought for no authorities to sustain it.

But another reason exists for refusing to enforce this part of the contract in favor of either party, and it must be remembered that neither can claim specific performance unless both are entitled to it. Admitting the correctness of the plaintiff's position, that the agreement is perpetual and runs with the land, no decree that could be made would be final. The court might be called on to readjust compensation and determine other matters in dispute between the parties every few months. In the Rutland Marble Company v. Ripley et al., 10 Wallace (U. S.) 339, L. C. P. edition, vol. 19, 955, the court says: "Another serious objection to a decree for a specific performance is found in the peculiar character of the contract itself, and in the duties which it requires of the owners of the quarries. These duties are continuous; they involve skill, personal labor and cultivated judgment. The agreement being for a perpetual supply of marble no decree the court can make will end the controversy. If performance be decreed the case must remain in court forever, and the court to the end of time may be called upon to determine, not only whether the prescribed supply of marble has been delivered, but whether every block was from the right place; whether it was sound, whether it was of suitable size or shape or proportion. Meanwhile, the parties may be con-

stantly changing. The marble company are liable so long as they hold the land, and Ripley's rights exist only while he holds the mill. It is manifest that the court cannot superintend the execution of such a decree. It is quite impracticable." See also P., C. R. R. Co. v. C. & T. R. R. Co., 13 Ohio State, 544; Johnston v. Shrewsbury & V. R. R. Co., 3 De G. M. & G., 914.

The agreements respecting the station are also contrary to public policy. It is broadly laid down in Beach on Railways, sec. 526, that "A contract to convey land to a railway company to secure the location of a station upon it is contrary to public policy, for railway stations are presumably located with a view to the convenience of the public, and no other motive should be allowed to operate to influence their location." In St. Joseph and Denver City Railroad Company v. Ryan, 11 Kansas, 602; s. c., 15 Am. Rep. 357, this matter was very fully and ably discussed. In the opinion, Justice BREWER, now of the United States Supreme Court, says:

"Can a railroad company, in consideration of the right of way, bind itself to build a depot on the grounds through which the right of way is obtained, and not to have or use any other depot within a given distance? Is a contract not to build or use a depot within certain limits a valid and binding contract? Railroad companies are private corporations, yet they are declared to be quasi public agencies. . . . It would seem to follow that the public has a right to say that they shall not be permitted, though private corporations, to make any contracts which would prevent them from accommodating the public in the matter of transportation in travel. The contract sued upon is a continuing one, and lasting through all time, and, if valid, no matter what may be the changes of population or the demand of business, the company is restrained from having or using other than the one depot within the limits of six miles. That at the time of the contract there was but a scanty population in the vicinity cannot affect the question, for no one can foresee where or how population may center in the future. Eighteen years ago no one could foretell the present size and population of Atchison, Leavenworth or Topeka, yet like contracts, if valid, might to-day operate to deprive each of them of the facilities of depots.

"Railroad corporations are, as we have seen, public agencies

and perform a public duty. They are agencies created by the public with certain privileges and subject to certain obligations. A contract that they will not discharge, or by which they cannot discharge those obligations, is a breach of that public duty and cannot be enforced. They are under obligations to use the utmost human sagacity and foresight in the construction of their roads to prevent accidents to passengers. A contract that they will not use such sagacity and foresight certainly cannot be upheld. They are under obligations to employ skillful and competent engineers to manage their engines, and other competent employees to superintend and take care of the running of their trains. A contract that they will not employ such agents and servants is certainly void. They are bound to furnish reasonable facilities for the transportation of freight and passengers, both as to the quality and quantity of cars and coaches and the number of trains. And a contract not to furnish such facilities will not be tolerated.

" Upon the same principle it is the duty of the railroad company to furnish reasonable depot facilities. The number and location of the depots, so as to constitute reasonable depot facilities, vary with the changes and amount of population and business. A contract to leave a certain distance along the line of the road destitute of depots is in contravention of this duty."

To the same effect is Marsh v. Fairbury and Northwestern Railway Company, 64 Illinois, 414; s. c., 16 Am. Reports, 564; Fuller v. Dame, 18 Pick. 472. See also Pacific Railroad Company v. Seely, 45 Mo. 212, and State v. H. & N. H. R. R. Co., 29 Conn. 538.

The views above expressed make it unnecessary to consider whether the covenants, if legal, would run with the land.

The court agrees with the conclusion of the learned master that the plaintiff is not entitled to equitable relief. Under the circumstances the costs were rightly placed on the defendants.

And now, to wit, September 25, 1893, all the exceptions to the master's report are overruled and the bill dismissed, the costs of the proceedings to be paid by the defendants. The master's fee is fixed at $200.

*Error assigned* was above decree.

*D. T. Watson* and *Frank H. Laird, Johns McCleave* with them, for appellant.—The covenants on both sides—those of the Smiths to grant the right of way and those of the railroad company—are continuous and run with the land, and bind and are beneficial to whoever at the time is the owner: Washburn on Real Property, 327; Van Rensaelaer v. Smith, 27 Barbour S. C. 104.

The facts that the Smiths were to erect a station house and to receive and deliver freight does not change the rule, for this is a permission from the railroad company to them, and is incidental to the receipt of the yearly compensation: Vyvyan v. Arthur, 1 B. & C. 410; Van Rensaelaer v. Hays, 19 N. Y. 68; Brett v. Cumberland, Cro. Jac. 522; Platt's Covenants, 532; Napier v. Darlington, 70 Pa. 64; Masury v. Southworth, 9 Ohio, 345; Oil Co. v. Blair, 113 Pa. 83; Washington Gas Co. v. Johnson, 123 Pa. 592; Fisher v. Lewis, 1 Clark, 422; Dunbar v. Jumper, 2 Yates, 74.

Eminent domain can only be exercised on failure to agree with the landowner. Then only the necessity arises to condemn. In this case the railroad company had agreed and hence could not condemn.

The necessity of taking particular property is a question for the courts, and should be decided in limine: Lewis on Eminent Domain, sec. 393; Randolph's Eminent Domain, secs. 49, 53, 335; Lance's App., 55 Pa. 25.

Equity has jurisdiction: Warner v. McMullin, 131 Pa. 370; Adams' App., 113 Pa. 449; Baugher v. Conn., 1 Pa. C. C. 184; Bank of U. S. v. Biddle, 2 Pars. 31; Bank of Ky. v. Schuylkill Bank, 1 Parsons, 180; Kirkpatrick v. McDonald, 11 Pa. 387; Skilton v. Webster, Brightly, 203; Adams's App., 113 Pa. 449; Bierbowers' App., 107 Pa. 14; Harper's App., 109 Pa. 9; Bitting's App., 105 Pa. 517; Electric Car App., 114 Pa. 574.

*Edward B. Daugherty,* for appellees.—Apart from the manifest acquiescense of Mr. Semple, or any action on his part against the possession of the company and expenditure of considerable money by it in permanent repairs on the station, the approval of the bond itself passed the title to the easement: Hoffman's App., 118 Pa. 512.

The landowner's only remedy is upon the bond in connection

with the statutory provision for assessment and collection of damages: Fries v. South Penna. R. R. & M. Co., 85 Pa. 73; Wallace et al. v. New Castle Northern Ry., 138 Pa. 168.

OPINION BY Mr. JUSTICE WILLIAMS, January 6, 1896:

The facts in this case are novel and the legal question raised upon them has not, so far as I am aware, been passed upon in any reported case. It seems that when the defendant company located the route for its railroad it was so located as to pass for the distance of fourteen hundred feet over the farm then held by the plaintiff's predecessors in title. The company desired to secure upon the same farm a piece of land on which to build a woodhouse, another on which to build a watertank, and a supply of water from the spring that furnished the dwelling house, to provide for its engines. Instead of instituting proceedings for the condemnation of the land and water needed, it entered into negotiations with the owner which resulted in an agreement in writing, by the terms of which the landowner granted a right of way over his land fourteen hundred feet in length and ranging from sixty to one hundred and ten feet in breadth, according to the character of the surface. He also granted the land for the woodhouse and watertank, and the water from his spring necessary to supply the watertank. He also agreed to build a suitable depot or station house on his own land adjoining the company's roadway, and to provide a person to sell tickets, take charge of passengers, and receive and deliver freight for patrons of the road at the station. The company on its part agreed to make use of the depot so to be erected, and to pay the landowner the same salary or commission " for receiving and delivering property or freight and money received for tickets " as it paid at other stations along the line of its road where the parties who owned the land over which the road passed owned also the buildings used for railroad purposes. This was probably a favorable contract for a struggling railroad company at the outset, but it was when looked at broadly an unwise one. It worked well while the landowner who negotiated it lived, but after his death the farm passed into other hands with whom the relations of the company were much less satisfactory and by whom its business was not done in a manner that satisfied the officers of the company. In other words, the contract under which the

company obtained all its rights upon and over this farm became a serious burden and a source of much negotiation and controversy. The question now arises how can the company be relieved of it, and be legally invested with the control of its own business at this station? It has the power to violate its contract, as it is now doing, by refusing to stop its trains at the depot building or to turn over its business at that point to any person representing the owners of the farm. This does not end the contract relation, but exposes the company to an action each year, if not oftener, for the recovery of damages for the refusal to perform the contract under which it entered upon its right of way and their privileges, and for which it has paid nothing but the annual rental or value fixed by the terms of the contract. If the contract is to be rescinded it must be by notice to the owners of the land, and a proceeding to substitute the value to be fixed by viewers to be appointed under the general railroad laws for the annual value agreed on by the parties. But the contract is an entire one. The consideration for all the rights secured by the railroad company under it is the price or commission to be paid to the landowner for his services as agent in the collection of freight and the sale of tickets at the depot building built and owned by him. The company cannot therefore rescind in part. It must stand on its contract rights or rescind in toto, and fall back upon its right of eminent domain to protect itself in the enjoyment of its right of way and the other rights acquired originally by the contract. Now the company has undertaken to rescind in part. It retains possession of its way, its water supply, and the land acquired under the contract, but seeks to avoid the payment of the annual rental therefor by the condemnation of the depot building erected and occupied by the landowner.

The result of this proceeding must be to turn the landowner over to successive actions for the recovery of damages from time to time for the refusal of the company to pay for what it declines to surrender, or to acquire by an exercise of eminent domain. The plaintiff asserts that this proceeding is against the law because in violation of the contract under which the company entered, and against equity because intended to disable her against her will from performing the services out of which the annual compensation arises. Her position is that so

long as the company affirms the contract by holding all that it
acquired under its provisions it cannot be allowed to rescind it
as to the one provision on which the compensation of the land-
owner rests.    In other words it cannot affirm as to what it was
to receive, and rescind as to what it was to pay.    We think the
contention is correct, and that the bill presents a proper case
for equitable relief.    The company must be required to elect
whether it will pay for its right of way and other privileges as
it agreed to, or by rescinding the contract, and proceeding
under the right of eminent domain, pay for it under the pro-
visions of the general railroad laws.    It may do either, but its
title must rest on a subsisting contract or on a valid appropri-
ation.    The learned judge of the court below treated this bill
as a bill for the specific execution of the contract, and because
he regarded the contract as an improvident one turned the plain-
tiff out of court.    The company did not regard it as improvi-
dent when it was made.    If now after many years of experiment
under it, and an increase in the value of its business at this
point, it finds some of its provisions inconvenient and burden-
some, the fair and only fair method of relieving itself is to re-
scind or terminate the agreement on notice, and proceed to
adjust the compensation of the landowner under the general
railroad laws.    That is what this bill in effect asks, and it is in
no sense specific execution.    It is conceded that under exist-
ing circumstances the company is not bound irrevocably to the
provisions of the contract, but what is contended for is that it
is bound until it exercises its election to rescind.    This it may
do at its pleasure, but it cannot hold under the contract as to
all it takes by means of it, and against the contract as to all it
was to give by way of consideration.    It is also urged that this
application comes too late since a bond was approved by the
court of common pleas on the application for the condemnation
of the depot building ; and the legal effect of the approval of
the bond is to pass the title to the land or easement to which
it relates.    This would be so if the entry was rightly made and
acquiesced in by the owner or upheld by the court.    It would
not be so if the entry was not rightfully made or if the bond
was tendered under circumstances such as made the proposed
exercise of eminent domain inequitable because palpably unjust.
The cases cited in support of this contention fairly illustrate

both the rule and the exception. In Wadhams v. The Lacka-
wanna and Bloomsburg Railroad Company, 42 Pa. 303, the land-
owner objected to the bond that the penal sum was not sufficient.
Upon this question he was heard in the court having jurisdic-
tion and that court overruled his objection, approved the bond,
and ordered it filed. The right of the company to enter was
not challenged. In fact it was conceded by the form of the
objection taken, and when that was overruled the bond stood
to the owner in lieu of the easement properly acquired by emi-
nent domain. In Fries v. The Southern Penna. Railroad &
Mining Company, 85 Pa. 73, neither the entry nor the bond
were objected to in any manner, so that the only question raised
was over the effect of an entry by virtue of eminent domain
accompanied by the giving of security for the payment of the
damages sustained thereby by the owner. We said in that
case that " The security being given in due course of law the
grasp of the owner upon his property is loosed by the constitu-
tion itself, and consequently the easement acquired passes freed
from his power to obtain payment otherwise than upon the
bond and the proceeding by assessment of damages given by
law." But the point raised in this case is over the question
whether the bond has been given in due course of law.

The right of the company to give it, or to require the plain-
tiff to accept it in exchange for the depot building and lot in
the face of the clear and unequivocal covenants securing the
use of the same to the landowner, is denied. Indeed it is the
question now to be determined upon final decree in this case.
If we conclude that the company has no right at law or in
equity to seize this building and the ground on which it stands
in the face of its covenants, and while holding its right of way
and other privileges under the same contract which secures
this building to the landowner, then it follows that the com-
pany took nothing by the tender of a bond which it had no
right to insist upon, and which the landowner was under no
obligation to accept and actually refuses to accept. To assert
the contrary is in effect to assert that although an entry may
be made without right it can be made effective to divest the
title of the person or corporation whose lands are wrongfully
entered if a bond can be gotten upon the files approved as to
the amount of penal sum and the sufficiency of the securities,

before the company can be stopped by an injunction from filing it. A result so monstrous would not be accepted, and the theory upon which it was reached would be rejected as unsound. It would deprive the landowner of the benefit of the judgment of a court of equity upon his right to protection against a deliberate violation of the contract which, while grasping all he had undertaken to convey, sought to wrest from him all that he was to receive in return. More objectionable still, it would deprive him of his recourse to a chancellor notwithstanding the fact that the machinery of the court was being made use of as the instrument for the accomplishment of this injury. We cannot assent to this position. The bond if accepted, or if the right to give it under the circumstances of the case was sustained by the courts, would stand to the owner in place of the easement lawfully acquired by the company from him. But if the seizure is unlawful, or has been permanently enjoined by a court of equity, the bond although approved by the common pleas and regularly filed among its records, must fall with the proceeding of which it is a part. If we restrain these proceedings no appropriation under the right of eminent domain can be consummated, there will be no easement for which the bond shall afford security, and it will become functus officio though remaining on the files. We see no reason therefore why the plaintiff is not entitled to come into a court of equity and ask to enjoin the proceedings entered upon to condemn her depot building until some other mode of payment by the company shall be substituted in the place of that which it is proposed to take away from her. If the contract is to be rescinded she has a right to insist that it shall be done in toto. If the right of way and other privileges are to be held against her under it, she has a right to ask for the compensation provided for by it, or its fair equivalent in damages. This contract seems to us as it did to the learned judge of the court below as one that ought never to have been made. It was improvident in the manner in which it committed the business of the company at that point to persons over whom the company had little if any control and absolutely no power of removal. But the company made it. It acquired valuable rights and privileges under it. It conducted business for years under it without apparent inconvenience or friction. The death of owners, the changes of interests,

the age and physical disabilities of the present holders of the title, and the unfriendly relations that have recently sprung up render it desirable that the contract relation should terminate and that the company should acquire its title under the right of eminent domain or by an out and out purchase from the owners, but as we have already said it cannot hold under the contract as to what it acquires and repudiate it as to the compensation to be paid. While it holds under the contract it must pay under the contract or an equivalent in damages. When it takes under eminent domain it must pay under the general railroad laws for its right of way and other privileges, if it wishes to retain them. Meantime an injunction must issue to restrain further proceedings looking to the separate condemnation of the depot buildings while the company continues to hold under the contract its right of way, water supply, and lots occupied for railroad purposes.

The decree is reversed, and the record remitted that an injunction may issue as above stated, and that the court below may ascertain the net amount fairly due to the plaintiff by reason of the violation by the company of its agreement, set forth in the bill of complaint. The appellee to pay the costs of this case.