# Palmer Water Co. *v.* Lehighton Water Supply Co., Appellant.

*Waters—Use of waters—Domestic use—Mutual use—Riparian owners—Diversion—Condemnation—Eminent domain — Prescriptive use.*

1. Every riparian owner is entitled to use so much of a stream running by or through his lands as may be necessary for domestic needs or other similar purposes.

2. The domestic uses of water are its natural and primary ones; the right to use it for mechanical purposes is secondary.

3. The use of water from a stream for extraordinary purposes must be such as will not sensibly or materially diminish the quantity.

4. The uninterrupted use of the waters of a stream for twenty-one years in a particular way affords a conclusive presumption of the right to use it in that way.

5. But the first appropriator's rights must not be extended beyond their proper limits through an incorrect conception of the law, or beyond its reasonable contemplation.

6. Nor should they be so regarded as to give rise to an abuse of a privilege to the detriment of communities dependent on the water's conservation and circumscribed use.

7. The property right of the first appropriator must be considered as having affixed to it the qualified rights the subject-matter makes necessary.

8. An appropriation of water without a bona fide intent that it shall be applied to a beneficial use, or one that is not followed within a reasonable time to carry out the purpose intended, is not an appropriation within the statute.

9. A resolution of appropriation by a board of a water company, and nothing more, does not give an absolute right to take the waters of a stream.

10. Nor will the acquisition by appropriation of land contiguous to a stream, unaccompanied by a public use of the water within a reasonable time, create such right, as against bona fide efforts to serve the public where needed.

11. Prior appropriations have regard to the quantity of water withdrawn rather than to the quantity in the stream.

12. The extent of the rights acquired, with the manner of the acquisition under color of the right of eminent domain and use,

is subject to a strict construction, owing to the abuse and injustice possible through a liberal view.

13. The purchase of land along a stream and the devotion of the waters to public use, to the injury of lower riparian owners, is not an appropriation under the right of eminent domain within the protection of authorizing statutes, and this rule is applicable to water companies.

14. The right to take water is limited to present or reasonable future needs.

15. Waste, destruction or pollution of water is not permitted to the detriment of the public good.

16. The first appropriator, to supply the maximum demand in all seasons, must erect suitable facilities to secure the necessary daily demand when the flow is at its minimum.

17. The storage reservoirs erected for such purpose must not only not unnecessarily waste the water, but must be of a capacity sufficient to satisfy this demand during the dry season of the year, with the entire minimum flow of the watershed counted.

18. These duties and obligations cannot be passed to junior appropriators who may take the surplus water.

10. Where the appropriations are on the same stream or legally cover the same watershed, and the first appropriator has taken reasonable precautions to conserve the supply for daily demand during droughts, and is serving the public, the first taker is entitled to the entire flow of the shed.

20. The junior taker during such period must let down the minimum flow of the stream, by passing it around the reservoir or permitting a quantity equal to the then minimum flow of the stream to escape from the reservoir.

21. Whether the appropriation of all the waters of a given stream includes the tributaries, depends on the character of the appropriation, the demand necessary, the extent and size of the catchment basin, the physical characteristics of the country, and many other matters, each case being controlled by its own facts.

22. A water company cannot retain the entire flow of a stream under an appropriation, and at the same time surrender a divisible portion of it; to reacquire this right, it must rescind its contract and recondemn.

23. The erection of a reservoir by a water company and diversion of the water of a stream for the performance of duties and obligations in supplying water to the public generally, as between competing companies for the same watershed, gives rise to a conclusive presumption of corporate action, fixing vested rights in the waters in the stream in the first occupier to the extent of such taking for immediate and reasonable future needs.

24. The conclusive presumption necessary to establish corporate action between companies claiming the same waters, lies in the uncontradicted evidence of actual use for corporate purposes before the second company comes on the ground.

*Trespass—Effect of verdict—Title.*

25. While a verdict in trespass establishes to some degree a right and the tortiousness of the acts complained of, it is not conclusive as to title, and especially is this so where a party interested is not a party to the action.

Argued April 15, 1924. Appeal, No. 29, Jan. T., 1924, and No. 2, Jan. T., 1918, by defendant, from decree of C. P. Carbon Co., June T., 1912, No. 1, on bill in equity, in case of Palmer Water Co. v. Lehighton Water Supply Co. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Reversed.

Bill for injunction to restrain taking of water. Before GROMAN, J., specially presiding.

The opinion of the Supreme Court states the facts.

Decree for plaintiff. Defendant appealed.

*Error assigned* was, inter alia, decree, quoting it.

*P. F. O'Neill* and *A. T. Walsh,* with them *F. W. Wheaton,* for appellant.—The right to the use of water for domestic purposes is primary and the right to its use as a mechanical power is secondary; and to the extent that the two rights conflict, its use as a mechanical power must be surrendered: Auburn v. Power Co., 90 Me. 576, 38 L. R. A. 188; Evans v. Merriweather, 4 Ill. 492, 38 Am. Dec. 106; Mayor v. Commissioners of Spring Garden, 7 Pa. 348; Boalsburg Water Co. v. Water Co., 240 Pa. 198.

Plaintiff did not acquire title to all of the waters of Big Creek: Hendler v. R. R., 209 Pa. 256.

Water, apart from land, is subject to the law of eminent domain: Larsh v. Test, 48 Ind. 130; State v. Supe-

rior Ct., 48 Wash. 277; Reading v. Althouse, 93 Pa. 400; Gring v. Sinking Springs Water Co., 7 Pa. Superior Ct. 63.

Plaintiff's condemnation was not sufficiently extensive to include all of the tributaries of Big Creek. In Boalsburg Water Co. v. Water Co., 240 Pa. 201, the resolutions of condemnation specifically designated the streams that the condemning company intended to take as a result of its condemnation proceedings.

The right of the Carbon Iron & Steel Co. to take water from Big Creek under the reservation set forth in its deed of conveyance to plaintiff, was the subject of condemnation. It was this right that defendant acquired by its resolution of condemnation, and for the invasion of which the Carbon Iron & Steel Company, Limited, has a right of action against defendant, if it suffered damages: Sheffield Water Co. v. Tanning Co., 225 Pa. 614.

*Jacob C. Loose,* and *Stevens Heckscher,* of *Duane, Morris & Heckscher,* for appellee.—While in rare cases property condemned by one corporation for public use may subsequently be condemned by another corporation for public use, in favor of such right there can be no implication, unless it arises from a necessity so absolute that, without it, the grant itself (to the second corporation) would be defeated. It must also be a necessity that arises from the very nature of things, over which the corporation has no control; it must not be a necessity created by the company itself for its own convenience or for the sake of economy: Penna. R. R. Co's. App., 93 Pa. 150; Pittsburgh Junction R. R. Co's. App., 122 Pa. 511; Groff's App., 128 Pa. 621; Scranton Gas & Water Co. v. C. & I. Co., 192 Pa. 80; Smethport R. R. v. R. R., 203 Pa. 176; Boalsburg Water Co. v. Water Co., 240 Pa. 199.

The supply of water from Big Creek is not adequate for the needs of plaintiff, the senior condemning company; while there is no necessity for defendant, the jun-

ior condemning company, to use the water of Pine Run, there being other adequate sources of supply.

The use by plaintiff corporation of the waters of Big Creek for manufacturing and commercial purposes, and fire emergencies, is a public use: Jacobs v. Water Supply Co., 220 Pa. 388; Conoy Twp. Supervisors v. Elec. Power Co., 222 Pa. 319.

Plaintiff company clearly condemned all of the water of Big Creek and the agreements entered into with the Carbon Iron & Steel Company and other riparian owners, after corporate action, did not affect its condemnation of all of said waters or work a release of any of the water condemned: Kenny v. Ry., 208 Pa. 30; Sheffield Water Co. v. Tanning Co., 225 Pa. 614.

Plaintiff's condemnation of all the waters of Big Creek was a condemnation of the water of Pine Run, an upper tributary flowing into Big Creek.

OPINION BY MR. JUSTICE KEPHART, May 12, 1924:

The Pohopoco, or Big Creek, rises in the Pocono Mountains and flows through Carbon County into the Lehigh River, being from twenty-five to twenty-eight miles in length. It has many tributaries, some of good size, of which Pine Run, the center of this controversy, is one of the largest. Big Creek drains a watershed of 110 square miles, a little less than half the new water supply of New York City, and about one-third the Croton Basin, which has heretofore supplied nearly three million people in New York, or a very few square miles short of being as large as Montour or Philadelphia County. It is about the size of the Hackensack River, supplying a population of approximately four hundred thousand, and its daily minimum flow, as found by the court below on a theoretical measurement, is fourteen million gallons. The undisputed testimony of exact measurements showed it to be from twenty-one to forty-two million, while other evidence placed it at various seasons of the year as high as two hundred and fifty mil-

lion.  The watershed of Pine Run, a part of the same valley, covers four square miles, with a daily minimum flow of 1,100,000 gallons, and a maximum of 1,750,000.

The Carbon Iron & Steel Company, located in this valley in 1854, constructed a reservoir across Big Creek known as the Parryville dam, and used the water continuously for manufacturing purposes, requiring from ten to twenty million gallons daily.  The water was conducted thereto from the dam by means of a flume, or mill-race, over land owned by the company.

The Lehighton Water Company, incorporated August 14, 1888, for the purpose of supplying water to the public in the borough of Lehighton, proceeded to construct its reservoir and perform its charter obligations.  The natural water basin, adaptable for Lehighton and Weissport uses, was that drained by Long Run; it was different from that on which Pine Run was located.  As the supply from the former was inadequate, the water company, in 1895, purchased land along Pine Run, erected a reservoir known as No. 3 dam, devoting its waters to public use.  All the franchises, structures, reservoirs, property and water rights owned by this and the company supplying Weissport, were leased to the Lehighton Water Supply Company, this appellant.  The latter company, with its predecessors, has continuously furnished a domestic supply from Pine Run since 1895, when the reservoir was first built.  At the present time the supply reaches a population of eleven thousand.

The Palmer Water Company, incorporated in 1899, for the purpose of supplying water in Lower Towamensing Township, adjacent to the Lehigh River, on April 28th, and November 9th, by resolution, appropriated the waters of Pohopoco or Big Creek and land adjacent thereto.  As the effect of this appropriation and its extent must be discussed later, we will not now recite any further facts relating thereto.  By agreement with the Carbon Company, the Palmer Company used the Carbon dam, placing therein its intake pipe.  The only customer

of the Palmer Company was the New Jersey Zinc Company.

For some time the three occupiers of the watershed had no difficulty. The Zinc Company, however, changed its noncondensing into condensing engines. This more than doubled the demand on the Palmer Company for water. Formerly six or seven million gallons would suffice, but, with the condensing feature reducing the cost of coal and increasing the power factor, its requirement rose to seventeen million. The ordinary flow of the thirty-inch main from the dam, eight million gallons daily, increased with the aid of a booster to eleven million gallons, was not sufficient, and a great scarcity of water existed during certain seasons. The bottom of the Carbon Company's flume was five feet below the top of the reservoir, and the Palmer intake below this. At no time, however, was the water less than twenty-six inches above the latter's intake.

As the Palmer Company's demand became greater, an injunction bill was instituted to restrain the diversion by Lehighton, and compel it to abandon its reservoir on Pine Run, tear out its pipes and permit the water to flow uninterruptedly to the Parryville Dam. The court below granted the injunction, and ordered the Lehighton Company to abandon its reservoir and pipes on Pine Run from which it had received a daily flow of 1,200,000 gallons. From this action the present appeal is taken.

The case presents many unusual features. Here we have the Lehighton Company, occupying the upper stream from which it supplied the public for some years before the Palmer Water Company existed, thrown off the stream because its board of directors failed to go through a form to appropriate the stream, though every other act of the company was consistent with the proper performance of its duties and obligations resting on it as a public servant. See Boalsburg Water Co. v. State College Water Co., 240 Pa. 198; Wagner v. Purity Wa-

ter Co., 241 Pa. 328, 331; Mier v. Citizens Water Co., 250 Pa. 536.

Water, like air, is one of the principal necessities of life; its place, as related to the public generally among our so-called commodities, is one of the utmost importance. Its use, and the law relating to its protection and conservation, is of greater importance in those sections where, because of the many mountain chains passing through our State, the configuration of the earth's surface is such that the supply during certain seasons becomes very limited. As a matter of public policy, the use of the waters of the state, subject to capture, should be so regulated as to conserve the supply to the best advantage, and be so separated between different localities as to effect the greatest possible good.

Since very early in the Commonwealth's history we held that water, as it flows in the various water courses, is not the subject of absolute ownership except by designated methods. Every riparian owner is entitled to use so much of a stream running by or through his lands as may be necessary for domestic needs or other similar purposes. The use for extraordinary purposes must be such as will not sensibly or materially diminish the quantity: Consolidated Water Supply Co. v. State Hospital for Criminal Insane, 66 Pa. Superior Ct. 610, 620, and authorities there cited; Com. v. Emmers, 221 Pa. 298, 303. The law recognizes, however, three methods by which the right to take all the water of a stream may be secured; grant, prescription, and appropriation or condemnation. An uninterrupted use of the waters of a stream for twenty-one years in a particular way affords a conclusive presumption of the right to so enjoy it: Strickler v. Todd, 10 S. & R. 63, 68; Bryant v. Pottsville Water Co., 190 Pa. 366. The Act of 1874, as amended by the Act of May 16, 1889, P. L. 226, empowers water companies "to appropriate so much of the water......as may be necessary for its purposes."

In discussing the effect of an appropriation, the elements entering into such taking must not be omitted. It is the combination that makes up the property right in the first appropriator under the protection of the state and federal constitutions. Obligations and duties rest upon the appropriator as a natural consequence of the powers granted by the state, and enlarged because of the vagrant character of this particular subject appropriated. Nothing like this appertains to other properties condemned. It is not a part of the soil or other similar natural resources, but comes to the land through rainfall. The first appropriator's rights must not be extended beyond their proper limits, through an incorrect conception of the law, or beyond its reasonable contemplation. Nor should they be so regarded as to give rise to an abuse of a privilege to the detriment of the vast population living in mountainous counties, who depend on water's conservation and circumscribed use. The property right of the first appropriator must be considered as having affixed to it the qualified rights the subject-matter makes necessary.

An appropriation without bona fide intent to be applied to a beneficial use, or one that is not followed by an effort within a reasonable time to carry out the purpose intended, is not an appropriation within the statute. A resolution of appropriation adopted by the board, and nothing more done, does not give an absolute right to take the waters. Nor would the acquisition by appropriation of land contiguous to the stream, unaccompanied by a public use of the water within a reasonable time, create such right as against bona fide efforts to serve the public where needed. It was very clearly held that the prior appropriations had regard to the quantity of water withdrawn rather than to the quantity in the stream. The purposes for which the water is used become important, as "the domestic uses of water are its natural and primary ones" (Mayor v. Commissioners of Spring Garden, 7 Pa. 348, 363) ; the right to

its use for mechanical purposes is secondary: Auburn v. Union Water-Power Co., 90 Me. 576, 38 L. R. A. 188; Evans v. Merriweather, 4 Ill. 492, 38 Am. Dec. 106.

The extent of the rights acquired, and the manner of the acquisition under color of the right of eminent domain and use, is subject to a strict construction owing to the abuse and injustice possible through a liberal view.

We have held the purchase of land along a stream and the devotion of the latter's waters to public use, to the injury of lower riparian owners, was not a taking or an appropriation under the right of eminent domain within the protection of authorizing statutes: Penna. R. R. Co. v. Miller, 112 Pa. 34; P. & R. R. R. Co. v. Pottsville Water Co., 182 Pa. 418; Clark v. P. R. R. Co., 145 Pa. 438; Com. v. Yost, 197 Pa. 171, 174; Com. v. Emmers, supra, 303; Scranton Gas & Water Co. v. D., L. & W. R. R. Co., 240 Pa. 604; Citizens Electric Co. v. Susquehanna Boom Co., 270 Pa. 517, 525; and the rule has been applied against water companies: Lord v. Meadville Water Co., 135 Pa. 122; Haupt's App., 125 Pa. 211; Philipsburg Water Co. v. Citizens Water Co., 189 Pa. 23, 31; Miller v. Hanover & McSherrytown Water Co., 240 Pa. 393, 395; Boalsburg Water Co. v. State College Water Co., supra. In the latter case, and in Wagner v. Purity Water Co., supra, noted again in Mier v. Citizens Water Co., supra, following the logical effect of these rulings, it was held that an appropriation must be predicated on corporate action by the board of directors properly evidenced, though the reasoning on which the rule is founded might be seriously questioned: Gring v. Sinking Spring Water Co., 270 Pa. 232, 252, 253; Katharine Water Co., 32 Pa. Superior Ct. 94, 99. However, as a general rule, the statutes throughout the various states usually prescribe a condition precedent to the exercise of the power of eminent domain requiring an ordinance, resolution or some corporate action. See 20 C. J. 888, sec. 315, et seq.

The right to take is limited to present or reasonable future needs. The extent of the appropriation or what land or waters it may embrace is subject to many considerations. All are brought within the purview of the "taking" and may become matters to be determined by the courts or the Public Service Commission. Waste, destruction or pollution of the water is not permitted to the detriment of the public good. A valid appropriation is, at best, but a qualified ownership. The first appropriator, to supply the maximum demand in all seasons, must erect suitable facilities to secure the necessary daily demand when the flow is at its minimum. The storage reservoirs erected for this purpose must not only not unnecessarily waste, but must be of a capacity sufficient to satisfy this demand during the dry seasons of the year, with the entire minimum flow of the watershed counted. These are burdens appurtenant to the property right acquired by the first appropriator, in its grant from the commonwealth of the right "to appropriate." These duties and obligations cannot be passed to junior appropriators who may take the surplus water: Boalsburg Water Co. v. State College Water Co., supra.

Half the counties of the state are dependent for their supply of water on large impounding reservoirs. These are filled during flood seasons by water which formerly passed over the first taker's dam into the sea. It would be unjust to require the water thus collected by junior appropriators to be used in dry seasons to augment the supply of the first taker to fill its daily demand, so carelessly neglected. On the other hand, where the appropriations are on the same stream, or legally cover the same watershed, and the first appropriator has taken reasonable precautions to conserve the supply for daily demand during droughts, and is serving the public, the first taker is entitled to the entire flow of the shed; "he has the best right who is first in time." The junior taker at these times must let down the minimum flow of the stream during such period, by passing it around his

reservoir or permitting a quantity equal to the then minimum flow of the stream to escape from the reservoir. The Public Service Commission regulates and controls many of these matters, and, on complaint filed, would require a compliance with these duties and obligations if neglected.

Here the Palmer Water Company appropriated Big Creek, claiming it included all the tributaries. We cannot lay down a flat rule which in and of itself would control the extent of territory or water taken under a condemnation. Whether an appropriation of all the waters of a given stream includes the tributaries depends on the character of the appropriation, the demand necessary, the extent and size of the catchment basin, the physical characteristics of the country, and many other matters. Each case must be controlled by its own facts, as indicated in Boalsburg Water Co. v. State College Water Co., supra, 213. "The entire flow of a small mountain run might be considered necessary," while "the presumption would be that no company would need all the waters of a river, or other large stream, for its corporate purposes."

Applying the principles we have discussed, we have a watershed or catchment basin covering 110 square miles. The tributary, Pine Run, on which appellant's dam is erected, covers four and one-half square miles. Appellee's resolution of appropriation did not include the waters of Big Creek and its tributaries. It "appropriates and takes the waters of Pohopoco Creek and the lands adjacent thereto, belonging to," etc., and "appropriates, demands and takes the waters of the Pohopoco or Big Creek, and lands under the bed of the creek and on both sides of the same, situate in the township of Franklin, County of Carbon, and State of Pennsylvania as follows": naming a few of the property owners on either side of the creek. Big Creek has some thirty tributaries, four large enough to be known by local names; a strict construction of this taking would include only the

waters named, and, as it omitted the tributaries, Pine Run would be eliminated. It is a fair argument that this was appellee's intention for the reason that, at the time the appropriation was made, Pine Run was already occupied by a company having the right of eminent domain whose sole business was to supply water and the company was in the actual, exclusive and notorious exercise of its corporate functions on this tributary. This is persuasive as to what appellee intended.

It appears that from four to six million gallons of water were wasted or lost daily from the Parryville dam through and under the breast and other places, but not over the breast or spillway. Such condition continued during dry as well as rainy seasons, in direct violation of one of the company's duties and obligations. It was required to erect suitable facilities to enable it to secure the maximum demand of twenty-seven million gallons daily, including that of the Carbon Iron & Steel Company as part. Assuming appellant had only a secondary right to the water, why should it be compelled to remove its pipes, reservoirs and other "obstructions" to permit a possible one million gallons in dry seasons to flow into the dam, used by appellee, only to be needlessly wasted, to the great detriment and distress of eleven thousand people who need this supply.

It is urged, however, that, as the Lehighton Company, prior to the institution of this suit, was merely along the stream as any other riparian owner, it could not complain as to what happened to the water below, having passed no resolution to condemn until after this suit had been instituted,—that its sale of water to the public was an act of a riparian owner, not under the protection of the statute: P. & R. R. R. Co. v. Pottsville Water Co., supra; Philipsburg Water Co. v. Citizens Water Co., supra, 31; Com. v. Yost, supra, 174. Assuming its entry in 1895, the erection of reservoirs, and supplying water to the public, was ineffectual to predicate a right

under the act, appellee overlooks other important principles affecting the Lehighton Company's claim.

The Palmer Company's resolution commenced to operate at a point above the Parryville dam; the only riparian owner on Big Creek below this point was the Carbon Company. For sufficient reasons, after the adoption of the resolution, the Palmer Company entered into an agreement with the Steel Company whereby it secured the right to uninterruptedly and perpetually use, *subject to an important reservation,* all of the water flowing into, over and from the dam. The reservation continued in the Steel Company unaffected, the complete enjoyment of its former estate, acquired by prescription, being the water necessary for the Steel Company's use, from ten to twenty million gallons daily. This right, under the contract, could be sold or passed to their successors. The Palmer Company could not retain the entire flow under the appropriation, and at the same time surrender a divisible portion of it. To reacquire this right, it must rescind its contract and recondemn: Semple v. Cleveland & Pittsburgh R. R. Co., 172 Pa. 369. To protect this right as immune from condemnation in the Steel Company through the Palmer appropriation, is to extend to the former company the full benefit of the power of eminent domain as it relates to this supply. This it did not enjoy through its own charter powers.

The legal effect of these acts was to abandon a part of the water condemned, or to restore to the landowner the right it formerly possessed. Appellee's contention that its second resolution cured this is untenable; it had scarcely passed the "paper stage."

This estate or right in the Steel Company to take water was the subject of condemnation or acquisition by prescription to the same extent and in the same way as though it were a separate stream. If either were accomplished it would not interfere with the contractual right of the Palmer Company, but any interference would be referable to the reservation in the contract

with the Steel Company, wherein the right remained in the latter to first take from ten to twenty million gallons of water daily out of Big Creek.

The Lehighton Company, for twenty-seven years actually took and used one million two hundred thousand gallons daily to supply the inhabitants of Lehighton and Weissport. There is no dispute as to the hostile character and extent of this taking: Strickler v. Todd, supra; Bryant v. Pottsville Water Co., supra. The mere fact that the Palmer Water Company instituted an action of trespass for the diversion, some years ago, did not determine finally the question of title. While a verdict in trespass establishes to some degree a right and the tortiousness of the acts complained of (Davis v. Southwest Pennsylvania Pipe Lines, 223 Pa. 56, 58; Holmes v. Wilson, 10 A. & E. 503, 113 Reprint 190), it is not conclusive as to title, and the Steel Company was not a party to the action.

In addition, appellee formally condemned these waters in 1913. This act was not a waiver of its claim to title by prescription then ripening for many years, as against the reservation in the Palmer-Carbon contract; other rights were thus acquired which could not be secured by prescription or which were not covered by it. The Parryville dam and appellant's dam were some miles apart.

If, then, the purchase of land, erection of a reservoir and diversion of water for the performance of duties and obligations in supplying water to the public, is not conclusive evidence of corporate action against a competing water company, yet as a riparian owner it would be entitled to hold the prescriptive right to use the water in a given way, to the same extent as a private individual.

We now hold that the erection of a reservoir and diversion of the water for the performance of duties and obligations in supplying water to the public generally, as between competing companies for the same watershed, gives rise to conclusive presumption of corporate action,

fixing vested rights to the waters in the stream in the first occupier to the extent of such taking for immediate and reasonable future needs.   While we give effect to the rule in the Boalsburg Case (rightfully doubted by the present Chief Justice in the Gring Case and by former President Judge RICE of the Superior Court in the Katharine Water Company Case), and will apply the rule so often announced by this court respecting the rights of lower riparian owners (as in the Lord Case), and the competing claims to water as between companies or individuals where the use of the water was an incident to its business (as in the Miller Case), and notwithstanding the dicta in the Philipsburg Case and the Boalsburg Case, the latter of which recognizes that the minute book is not the sole depository of the evidence necessary to prove corporate action, still the conclusive presumption necessary to establish corporate action between companies claiming the same waters lies in the uncontradicted evidence of actual use for corporate purposes before the second company comes on the ground. This conclusion fixes Lehighton's right beyond question.

Had there been merit to sustain appellee's position throughout, the limit of the power of the court below was to direct appellant to let down the minimum flow of the stream during dry seasons, but, during the seasons when there was a surplus of water, appellant would have had authority to take the water necessary for its corporate purposes.   However, as we have pointed out, appellee, on the record as presented to us, was not entitled to an injunction.

The decree of the court below is reversed and the bill in equity is dismissed, at the cost of appellee.