Philadelphia, Appellant, *v.* Philadelphia Suburban Water Co., Appellant.

Argued February 3, 1932.  Before FRAZER, C. J., SIMP-SON, SCHAFFER, MAXEY, DREW and LINN, JJ.

A. *Evans Kephart* and *G. Coe Farrier,* Assistant City Solicitors, with them *David J. Smyth,* City Solicitor, and *Franklin L. Wright,* for City of Philadelphia.—The findings of fact by a chancellor, when supported by evidence and reasonable inferences therefrom, have the effect of a verdict by a jury: Feuerstein v. Realty Co., 304 Pa. 271; Rokeach v. Polish Co., 295 Pa. 366; Glenn v. Trees, 276 Pa. 165.

The city has the right to the whole flow of the Schuylkill River and its tributaries by reason of the conclusive presumption of corporate action appropriating or condemning such flow: P. R. R. v. Coal Co., 281 Pa. 233; Boalsburg Water Co. v. Water Co., 240 Pa. 198; Reeves v. Water Co., 287 Pa. 376; Croyle v. Water Co., 259 Pa. 484.

That the Schuylkill is a navigable river has been recognized for over a century and a half. It was made navigable by the Act of March 14, 1761, 1 S. L. 235: Phila. v. Collins, 68 Pa. 106; Phila. v. Gilmartin, 71 Pa. 140.

That the public has a right to have sufficient water flow down a navigable river so that navigation will not be impeded or impaired, and that such right is paramount to the right to use water from a navigable river for water supply purposes has also been clearly established: Phila. v. Gilmartin, 71 Pa. 140; Hunt v. Graham, 15 Pa. Superior Ct. 42; Flanagan v. Phila., 42 Pa. 219; New York v. New Jersey, 283 U. S. 336.

The city has acquired a prescriptive right to at least 219,893,205 gallons a day from the Schuylkill River and its tributaries by reason of its uninterrupted, adverse use of such water for a period of twenty-one years. Such prescriptive right, coupled with the city's power to condemn, places the city in the same position as if it had exercised such power: Palmer Water Co. v. Water Sup-

ply Co., 280 Pa. 492; Messinger's App., 109 Pa. 285; Darlington v. Painter, 7 Pa. 473; Irving v. Media Boro., 194 Pa. 648.

The water company should be enjoined from proceeding with its appropriation of the Perkiomen because it will impair the quality of the water of the Schuylkill at Philadelphia: Howell v. M'Coy, 3 Rawle 255, 269; Wheatly v. Chrisman, 24 Pa. 298; Citizens' Electric Co. v. Boom Co., 270 Pa. 517; 525; Com. v. Russell, 172 Pa. 506; Com. v. Emmers, 221 Pa. 298.

The water company cannot condemn waters already appropriated by the city: D., L. & W. R. R. v. St. Ry., 289 Pa. 131; Pitts. Junction R. R. Co.'s App., 122 Pa. 511; Boalsburg Water Co. v. Water Co., 240 Pa. 198.

The city as a riparian owner is entitled to an injunction restraining the water company from proceeding with its appropriation of the waters of Perkiomen Creek because the water company has no present or reasonable future need necessary to be supplied from such source: Palmer Water Co. v. Water Supply Co., 280 Pa. 492; Boalsburg Water Co. v. Water Co., 240 Pa. 198.

The water company's appropriation of the Perkiomen will interfere with the quantity from the Schuylkill to which the city has a right by prescription.

As a general rule, in order that a use may be continuous, it is not necessary for it to be constant, and a continuous use is not interrupted by a temporary failure to use: Hesperia Land, etc., Co. v. Rogers, 83 Cal. 10, 23 P. 196; Hitchens v. Land Co., 65 Colo. 597; 19 Corpus Juris 881, 882, 883; Reimer v. Stuber, 20 Pa. 458.

The city will be irreparably injured if forced to abandon any portion of its stations or equipment on the Schuylkill and to erect new facilities on the Delaware: Reeves v. Water Co., 287 Pa. 376.

The city's right to the waters of the Schuylkill includes the right to the waters of its tributaries, including the Perkiomen.

The city has taken reasonable precautions to conserve water at times of minimum flow: Palmer Water Co. v. Water Supply Co., 280 Pa. 492.

The city does not waste any water of the Schuylkill.

The city has a right to the waters of the Perkiomen for the purpose of diluting the pollution of the Schuylkill at its intakes.

The city has the right to as much of the flow of the Schuylkill and its tributaries as it needs by reason of legislative grant: Reeves v. Water Co., 287 Pa. 376; Croyle v. Water Co., 259 Pa. 484.

*A. M. Holding* and *Robert von Moschzisker,* with them *High, Dettra & Swartz,* for Philadelphia Suburban Water Co.—Under all of the evidence, and upon the findings of the court below, the company's appropriation of 10 millions of gallons from the Perkiomen cannot reduce the flow of the Schuylkill at Philadelphia to a quantity below that to which the city is entitled: Palmer Water Co. v. Water Co., 280 Pa. 492; Irving v. Media, 10 Pa. Superior Ct. 132; Brubaker v. Poor Dist., 15 Pa. D. & C. 191; Phillipsburg Water Co. v. Water Co., 189 Pa. 23; Boalsburg Water Co. v. Water Co., 240 Pa. 198.

Philadelphia has a practically unlimited supply of water from the Delaware River, a less polluted and better water than that of the Schuylkill. It cannot, therefore, be irreparably injured by the company's appropriation of the water from the Perkiomen.

Philadelphia, as the first taker of the water of the Schuylkill, is bound, as against the company, the second taker, to provide reasonably necessary storage reservoirs to accumulate and hold the waters of the river in times of high flow for its use in times of minimum flow; and it has not met this obligation: Palmer Water Co. v. Water Co., 280 Pa. 492.

Philadelphia wastes, or permits to be wasted, a quantity in excess of the 10 million gallons appropriated by

the company, and for this reason the bill must be dismissed.

Philadelphia requires, and bases its right to, the waters to dilute and abate the pollution of the river, which it causes and permits, and this, under the law, is, as against the company's lawful appropriation, an unlawful purpose: Palmer Water Co. v. Water Co., 280 Pa. 492; Owens v. Lancaster, 182 Pa. 257; P. R. R. v. Coal Co., 281 Pa. 233.

The company's condemnation of 10,000,000 gallons from the Perkiomen invades no right of the city in the Schuylkill entitling the city to equitable relief: Irving v. Boro., 10 Pa. Superior Ct. 132; Messinger's App., 109 Pa. 285; McCallum v. Water Co., 54 Pa. 40; Darlington v. Painter, 7 Pa. 473.

The city's prescriptive right is limited to the actual user persisted in for each of twenty-one consecutive years without material interruption or change.

It is obvious that the water company's condemnation of 10,000,000 gallons daily from the Perkiomen leaves a surplus (over the 106,849,000 gallons to which plaintiff is entitled) of 63,000,000 gallons from the minimum flow; and, of course, the water company's taking is not in law or in fact a condemnation of property previously condemned by another utility, the municipality acting as a utility in this case: Phila. v. Gilmartin, 71 Pa. 140, 157; Girard Life Ins. Co. v. Phila., 88 Pa. 393, 394; Com. v. Casey, 231 Pa. 170, 178; Barnes Laundry Co. v. Pittsburgh, 266 Pa. 24.

The city has failed to meet its obligations, as a prior taker, to provide necessary reservoirs to impound flood flows for use in times of minimum flow, and it has failed to eliminate waste of water: Palmer Water Co. v. Water Supply Co., 280 Pa. 492.

In the face of the evidence and the finding that compulsory metering materially reduced the per capita consumption, the chancellor's refusal to find that the city was at fault in this connection is not supportable.

OPINION BY MR. JUSTICE DREW, September 26, 1932:

The Philadelphia Suburban Water Company, by resolution of its board of directors on October 25, 1927, sought to condemn and appropriate 10,000,000 gallons of water per day of the normal flow of Perkiomen Creek, the principal tributary of the Schuylkill River. On November 7, 1928, the City of Philadelphia filed a bill in equity in the Court of Common Pleas of Montgomery County, averring that if the company be permitted to appropriate and divert any part of the flow of Perkiomen Creek, grave and substantial injury would result to the city and its inhabitants, inasmuch as the waters of that stream are necessary to maintain the volume and quality of the Schuylkill River, on which the city depends for its water supply, and praying that the company be enjoined from taking any of the waters of Perkiomen Creek for water supply purposes. In answer to the bill, the company denied that Philadelphia was entitled to any of the waters of Perkiomen Creek, or that condemnation by the company would result in any injury whatsoever to the city or its inhabitants. After an extensive hearing and regular proceedings, a final decree was entered in April of 1931, from which both parties appealed, and the case came before this court in February, 1932.

The importance of the case, involving as it does the water supply of almost two and one-half million people, more than one-quarter of the population of the Commonwealth, demands that we weigh most carefully every revelant fact. We therefore set down in detail the situation from the record as we understand it.

Among the chancellor's findings of fact are the following: The City of Philadelphia is situated at the confluence of the Delaware and Schuylkill Rivers. It owns and controls and operates the works, dams, reservoirs, apparatus, machinery and other contrivances by which its inhabitants are being supplied with water for domestic and industrial purposes, and by which they have been supplied since 1801. The Schuylkill was the city's sole

source of supply until 1909, when it took steps to get additional water from the Delaware. At the present time 45 per cent of its water supply comes from the Schuylkill, and 55 per cent from the Delaware. Within a territory of 130 square miles it supplied, in 1929, approximately 360,000,000 gallons of water a day to a population estimated at 2,100,000 people, and increasing between 30,000 and 35,000 annually. At the present per capita consumption of 168 gallons per day, this increase in population means an increasing yearly demand for water of 6,000,000 gallons daily.

The defendant company, a Pennsylvania corporation, was formed in October, 1923, by merger of thirty-four constitutent water companies, all chartered before April 13, 1905, and all possessing the power of eminent domain. It is engaged in the business of selling water for profit within a unified territory of 300 square miles in Chester, Delaware and Montgomery Counties, which territory touches the city on three sides. Like the city, it also gets its water supply from the watersheds of the Schuylkill and Delaware Rivers; the city taking its water from the rivers at Philadelphia, the company from the tributaries of the rivers—55 per cent of its supply from tributaries of the Delaware, and 45 per cent from a tributary of the Schuylkill. The company supplied, in 1929, an almost wholly suburban population of 300,000 people with approximately 20,000,000 gallons of water per day. This population is increasing about 25,000 a year. At the present per capita consumption of 60 gallons per day, the company's annual increasing need for additional water is 1,500,000 gallons per day. The chancellor found that the company needs an additional 10,000,000 gallons of water per day for its present and reasonable future requirements. To meet the demand made upon it by this increasing population, the company surveyed available streams in and near its chartered territory, and decided to condemn the waters of Perkiomen Creek to obtain the needed supply. It chose as the place

for diverting the water condemned a site on Perkiomen Creek one mile above the point where it flows into the Schuylkill. The company proposes to supply the water so condemned to its customers within its chartered territory.

The minimum flow of the Schuylkill is 180,000,000 gallons of water per day at Philadelphia. Its average flow is over one billion gallons per day. The minimum flow of the Delaware is one billion, two hundred million gallons per day, and the average flow is between five and six billion gallons per day. Under the present agreement with the State of New Jersey, the city is apparently entitled to one-half of the flow of the Delaware at Philadelphia, or about six hundred million gallons per day. (But see New Jersey v. New York, 283 U. S. 336.) Perkiomen Creek is the principal tributary of the Schuylkill, and joins that river at a point about fifteen miles above the city limits of Philadelphia. It has a minimum flow of 35,000,000 gallons of water per day, or $\frac{7}{36}$ of that of the Schuylkill, and an average flow of 365,000,000 gallons per day; its watershed covers an area of 360 square miles, none of which is served by either the city or the company. The water of Perkiomen Creek is far superior in quality to that of the Schuylkill, and is a factor, particularly in times of minimum flow, in lessening the contamination of the river. The Delaware is now less polluted than the Schuylkill, and is more suitable for water supply purposes, but the water of the Schuylkill is softer than that of the Delaware and would be preferable as a source of supply were it not for its present pollution.

The city is drawing 170,000,000 gallons per day at its three Schuylkill pumping stations at Philadelphia. It has facilities at its Belmont station to draw 25,000,000 additional gallons per day, and it plans to take that amount in addition to its present draft. The city's present and reasonable future requirements from the Schuylkill were found by the chancellor to be 200,000,000 gallons per day. In view of the proved and known in-

evitable needs of so large a population, increasing rapidly, this figure seems low.

A tabulation of the drafts made by the city from the Schuylkill from 1892 through 1928 was introduced in evidence, and the chancellor found that from 1892 to 1912, inclusive, a period of twenty-one years, the average amount drawn by the city from the Schuylkill was 219,893,205 gallons per day. In 1892 over 153,000,000 gallons per day were drawn, and by irregular steps this amount increased to over 297,000,000 gallons in 1903, then it dropped again by irregular steps to 230,000,000 gallons in 1908, and then suddenly in 1909, coincident with the city's first use of water from the Delaware, it dropped to 109,000,000 gallons per day, and then to 106,849,000 in 1914. From 1914 on it increased irregularly from year to year until 1921, when it was 119,000,000 gallons; the next year it increased to 175,000,000, and it has remained in the neighborhood of 170,000,000 gallons since 1922. The city takes the rest of its water supply, now amounting to 190,000,000 gallons per day, from the Delaware River at Torresdale. It maintains reservoirs for the storage of water at eleven points, having a total capacity of 1,300,000,000 gallons, or about four days' water supply. None of these reservoirs, however, increases the minimum flow of the Schuylkill.

The company's water supply is drawn from four streams. It has condemned the entire flow of Crum Creek, a tributary of the Delaware, with a minimum flow of 4,000,000 gallons per day, and by the erection of a dam has increased that flow to 6,000,000 gallons per day. It has condemned the entire flow of Neshaminy Creek, a tributary of the Delaware, with a minimum flow of 3,600,000 gallons per day, and has increased that flow to 4,000,000 gallons per day. It purchased Pennypack Creek, also in the Delaware watershed, which produces about one million gallons per day. From these three sources the company draws 11,000,000 gallons per day, or 55 per cent of its supply. It has also condemned the

entire flow of Pickering Creek, in the Schuylkill water-shed, a stream with a minimum flow of 4,000,000 gallons per day, which it increased to 9,000,000 gallons per day by the erection of an impounding reservoir.

Both the city and the company have potential sources of water supply other than the Schuylkill watershed. The city can increase its draft from the Delaware at Torresdale, and the company can further develop its present sources of supply. An additional 11,000,000 gallons per day could be obtained from Crum Creek at a cost of $1,000,000; or, by the expenditure of $400,000 and the raising of the height of the existing dam, an additional daily flow for fifty days of 10,000,000 gallons could be produced. The flow of Neshaminy Creek, now 4,000,000 gallons, could be developed to 210,000,000 gallons of water per day, but the cost of this project is figured at $20,000,000. Pennypack Creek, now yielding 1,000,000 gallons per day, has an estimated potential flow of 27,000,000 gallons per day; the cost of development does not appear. To remove 10,000,000 gallons of water per day from Perkiomen Creek would cost approximately $300,000.

The company's system is so arranged that water from any source can be distributed to all parts of its service area, and the same is likewise true in large measure of the system of the city.

As already noted, Philadelphia has used the Schuylkill since 1801 as a source of water supply. In 1807 (Act of April 9, 1807, P. L. 189), one Robert Kennedy was granted the right to maintain a dam and mill race near the Falls of Schuylkill, with a reservation to Philadelphia of a privilege to purchase at any time for a water supply; this right the city bought in 1818 for $150,000. In 1819 it entered into an agreement with the Schuylkill Navigation Company (which by Act of March 8, 1815, P. L. 72, was entitled to "use the water power from the said river," and to "sell,......lease or rent......the said water power"), which provided that

upon the erection of a dam at Fairmount, the navigation company might draw off as much water as might be necessary for navigation, and that the city "shall and may enjoy all the remainder of the said river" as a supply of water; in pursuance of this agreement the city erected Fairmount Dam, and created a reservoir in the Schuylkill River known as Fairmount Pool. Recently reconstructed at a cost of $600,000, this dam impounds the water of the Schuylkill for a distance of seven miles, forming a pool of an average width of 500 feet and a depth of five feet. In 1824, by a further agreement between the same parties, it was agreed that the city "shall have the full, absolute and uncontrolled use, enjoyment of the whole water and water power of the River Schuylkill at the said dam at Fairmount without any restrictions or reservations whatever saving only the reservation of so much thereof as may be necessary for the purposes of the navigation of said river......" The city's interest in and right to use the Schuylkill for water supply purposes has been frequently recognized by various acts of assembly looking to "the preservation of the purity of the water supply of the City of Philadelphia." (Act of March 26, 1867, P. L. 547. See also Act of April 12, 1828, P. L. 314, and Act of March 26, 1832, P. L. 188.) Fairmount Park, comprising 3,647 acres owned by the city on both banks of the river, was established by the legislature "to preserve the purity of the water of the River Schuylkill." (Act of March 31, 1860, P. L. 476; Act of February 12, 1861, P. L. 30; Act of 1867, supra; Act of March 15, 1871, P. L. 363.) By the Act of April 18, 1843, P. L. 304, the legislature authorized the several districts in the County of Philadelphia to erect works to take water from the Schuylkill River for the supply of their inhabitants, and additional pumping stations were erected therefor at least as early as 1845. (See Mayor v. Comrs. of Spring Garden, 7 Pa. 348.) All rights acquired by that act became vested in the city by section 37 of the Act of February 2, 1854, P. L. 21,

consolidating all of the districts in the County of Philadelphia with the original City of Philadelphia.

Although the city's water service is not at the present time all metered, ordinances have been passed making the metering of all commercial and industrial establishments, and other large consumers of water, compulsory, and requiring new customers to install meters, with the result that, in 1929, 25 per cent of the services were metered, and the per capita consumption had decreased about 25 gallons per day. The system of the company is entirely metered. Claiming that a complete metering of the city's services would result in a large daily saving of water, and that the city permits fire plugs to be opened to allow water to run on the streets in the thickly congested districts in the heat of summer, the company contends that the city tolerates great waste of water, and, therefore, cannot complain of the company's attempt to take 10,000,000 gallons per day from Perkiomen Creek. When the testimony in regard to the practice of opening the fire plugs was given, the chancellor remarked that such a use of water was almost a necessity; we agree that on the facts of this case such use should not be considered waste. The chancellor, in his discussion of the adjudication, states that the policy of the city as evidenced by its metering ordinances and its repair of Fairmount Dam in order to prevent leakage is the opposite of wasteful. We therefore construe his findings as negativing the charge of waste.

Under our decisions, the above findings of fact made by the chancellor, supported as they are by evidence or reasonable inferences therefrom, have the effect of the verdict of a jury (Feuerstein v. New Century Realty Co., 304 Pa. 271), and we accept them as the facts of this case.

The court below held that the city has a prescriptive right to the water of the Schuylkill, and is entitled to take therefrom an amount equal to its smallest daily draft in the twenty-one years prior to the filing of the

bill; that, therefore, if the daily flow of the Schuylkill at Philadelphia should drop below that amount, then the company should not interfere with a daily flow from the Perkiomen of $\frac{7}{36}$ of that amount, the percentage of the flow of the Schuylkill that the Perkiomen contributes in times of minimum flow. Accordingly, the following final decree was entered:

"If and when the daily flow of the Schuylkill River at Philadelphia is reduced to one hundred and six million and eight hundred and forty-nine thousand (106,849,000) gallons of water, the Philadelphia Suburban Water Company, the defendant, is enjoined and restrained from interfering with a daily flow of twenty million, seven hundred and seventy-six thousand and one hundred and ninety-four and four-ninths (20,776,194$\frac{4}{9}$) gallons of water of the Perkiomen Creek."

The city appealed, contending that the decree is inadequate and in reality a nullity; the company also appealed, contending that no injunctive relief whatsoever is warranted by the evidence.

The wrong which the city now seeks to prevent is the threatened invasion of its alleged vested right to the water and flow of the Schuylkill River as affected by Perkiomen Creek. This threatened invasion, it is alleged, will result from the exercise by the company of the claimed superior right to ten million gallons of the "normal flow" of that creek. In determining the issues presented, we must, inter alia, consider and pass upon the following questions: (1) What are the rights of the city in and to the water of the Schuylkill River? (2) What, if any, are the rights of the city to the water of Perkiomen Creek? (3) How will the exercise by the company of its claim to water of Perkiomen Creek affect any vested right of the city to water of the Schuylkill River? (4) What right to the water of Perkiomen Creek has the company acquired by virtue of its attempted condemnation?

The Schuylkill is a navigable river, and as such is a public highway (Phila. v. Collins, 68 Pa. 106; Phila. v. Gilmartin, 71 Pa. 140), the title to the bed and waters of which is held by the State for the benefit of the public: Carson v. Blazer, 2 Binn. 475; Shrunk v. Schuylkill Navigation Co., 14 S. & R. 70. Therefore, it cannot, properly speaking, be made the subject of the exercise of the power of eminent domain. That "is the sovereign power vested in the Commonwealth to take private property for public use:" Phila. Clay Co. v. York Clay Co., 241 Pa. 305. Inasmuch as the river is already public property, it cannot be taken for the public. But the Commonwealth may grant to a person or corporation any rights in the river which do not interfere with navigation. This right of the State to allow the use of navigable rivers by others is undoubted, hence we have canal companies, bridge companies, and municipalities and water companies given the right to use such streams. On the Schuylkill, for example, we find that the General Assembly in 1807 gave to Kennedy the privilege of maintaining a dam and mill race on the river, and in 1815 gave to the Schuylkill Navigation Company the right to use water power from the river; likewise the privilege of taking water from the river for water supply purposes was expressly given to the Norristown Water Company (Act of April 16, 1840, P. L. 418) and to the Conshohocken Gas & Water Company (Act of May 12, 1871, P. L. 774).

That Philadelphia was granted the right to use the Schuylkill as a source of water supply cannot be questioned. It began to draw upon the river as early as 1801, and in 1818 it exercised the right reserved to it by the Act of 1807, supra, by purchasing the privilege which had been granted to Kennedy. By the agreements of 1819 and 1824, already referred to, it purchased from the Schuylkill Navigation Company all the water and water power of the river at Fairmount, except so much as was required for navigation—although the power of

the navigation company to sell the water itself may be doubted. (See Mayor v. Comrs. of Spring Garden, supra.) If, after the foregoing, there could be any doubt of the right of Philadelphia, by legislative grant, to take water from the Schuylkill, and we have none, it would be entirely swept away by the Acts of 1843 and 1854, supra, the former of which gave the several districts of the County of Philadelphia not then incorporated in the city express authority to take water from the Schuylkill for the use of their inhabitants, and the latter vested in the city all the rights thus acquired upon the incorporation of those districts into the city. In addition, the legislature has frequently recognized the dependence of Philadelphia upon the Schuylkill, and by various acts of assembly from 1828 to 1871 provided for keeping the waters of the river pure, for the protection of the dams and other facilities erected by the city, and for the establishment of Fairmount Park so that the water supply of Philadelphia might be safeguarded and preserved. These legislative expressions of concern cannot be disregarded in determining Philadelphia's right to the waters of the river, particularly when coupled with an actual, continuous, open, known and hostile taking for beneficial use for more than 125 years without objection from anyone. The only possible conclusion, therefore, is that Philadelphia has been given by the State itself the right to appropriate and take the water of the Schuylkill River for the domestic and industrial uses of its people.

The court below reached its conclusion by a rigid application of the doctrine of prescription. While the city by its long continued use acquired a prescriptive right to take water from the Schuylkill, against anyone but the State, that doctrine is clearly not applicable to this case. The right of the city is founded on legislative grant, which required no period of years to establish, and which transcends any right obtained by prescription in a navigable stream. We now hold that the right of Philadel-

phia to take water from the Schuylkill is by express grant of the Commonwealth, the owner of that river.

The next question is, what is the extent of this grant? The only restriction imposed by the legislature was that "no more water shall be taken from the said river..... than shall be required, for the purpose of affording..... the people of the aforesaid districts with a sufficient supply of water:" Act of 1843, supra. This could mean but one thing—a right to take whatever water was necessary for reasonable present and future needs. The legislature was certainly not blind to the growing and expanding requirements of the first city of the Commonwealth. In fact, the preamble of the Act of 1860, supra, makes mention of "the rapid expansion of the city on the west of the River Schuylkill." It must not be forgotten that when this grant was made the Schuylkill was the city's sole source of water supply. It could not have been intended that Philadelphia should not be permitted to take as much water as it actually needed for domestic and industrial purposes. This privilege it exercised for more than a century, and its right to do so has heretofore never been questioned. We have held that a water company, in the exercise of its power of eminent domain, has the right to appropriate and condemn as much water as is reasonably necessary for its present purposes and future needs: Boalsburg Water Co. v. State College Water Co., 240 Pa. 198; Croyle v. Johnstown Water Co., 259 Pa. 484. We cannot construe a legislative grant to a municipality to take water more narrowly. Philadelphia is therefore entitled to take from the Schuylkill as much water as is reasonably necessary to satisfy the present and future demands of its inhabitants. The chancellor has found that amount to be 200,000,000 gallons per day.

We reach the same conclusion in another way. In Palmer Water Co. v. Lehighton Water Supply Co., 280 Pa. 492, we held that a corporation chartered for the purpose of supplying water to the public and possessing

the power of eminent domain, which had erected a reservoir and diverted water from a stream for the performance of its corporate duties and obligations, was, as against a competing company in the same watershed, conclusively presumed to have taken whatever corporate action was necessary in order to establish its right to meet its present and reasonable future needs from that stream. Certainly the City of Philadelphia is not to be placed in a less advantageous position. While the instant case does not involve a failure to comply with the formalities required in the exercise of the power of eminent domain, as did the Palmer Case, yet we believe that a doctrine analagous to that of presumed necessary corporate action, as there stated and applied, may and should be employed here. Its application is not only justified by the record as made (although perhaps not artistically pleaded or clearly relied upon in the original pleadings), but it would, we think, result in a close approximation of justice. We therefore hold that Philadelphia, by its early taking and diversion of water, its erection of waterworks and other facilities, and its long continued use of the water of the Schuylkill in the performance of its duties and obligations to its inhabitants, must have intended to take and did take any corporate action necessary to appropriate so much of the flow of the river—over and above the needs of navigation—as would supply not only the present but future requirements of its population. On the finding of the chancellor, this amount, for the present and immediate future, has been fixed at 200,000,000 gallons per day. How much of the flow of the river the city may require later must necessarily be left for the future to determine.

It is strongly urged by counsel for defendant company, however, that if the doctrine of presumed corporate action is found applicable, the amount of water to which the city would be entitled would be fixed by the amount to which a prescriptive right was gained by continuous user over a period of twenty-one years. This

contention is based on the case of Irving v. Media Boro., 194 Pa. 648, in which we affirmed, per curiam, the opinion of the Superior Court written by President Judge RICE. As we have said, the rights of the city cannot be measured by the application of the doctrine of prescription, because under the circumstances of this case it is inapplicable, unjust and contrary to the clearly expressed policy of our Commonwealth for over a century. Furthermore, the issue in the Media Case was between a lower riparian owner and a borough taking water from the upper reaches of a small stream, a situation not comparable to that before us. However, in that case Judge RICE said: "If, originally, the defendant had changed the course of the stream by turning it away from the lower owners, or by some other act, of which the lower owners had notice, had indicated a present purpose to permanently appropriate so much of the water of the creek as might not only then, but in the future, be required to supply the wants of the inhabitants, a different question would be presented." The "different question" thus anticipated by that learned and able judge is precisely that presented by the instant case. Philadelphia, day by day for more than a hundred years, indicated its present purpose to permanently appropriate as much of the water of the Schuylkill as it required for present and future needs by actually taking in increasing amounts all the water it needed. The Media case, therefore, is not modified by this decision.

The 200,000,000 gallons of water per day to which Philadelphia is entitled, subject of course to the requirements of navigation and riparian owners, is considerably in excess of the minimum flow of the Schuylkill. No claimant, therefore, whose right is junior to that of the city, may make any diversion of water from the river which would materially diminish its volume in low-flow times, and thus interfere with the city's right to the amount of water which it needs. The Perkiomen being the largest tributary of the Schuylkill, any considerable

taking of water therefrom would necessarily affect the flow of the river, and consequently no junior comer, such as the defendant company, may divert water from that stream so as to reduce the flow of the Schuylkill below the volume to which Philadelphia is entitled. Logically, this conclusion is inevitable, because the city's claim to water of the Schuylkill would be worthless if the flow of its tributaries could be cut off; the river is but the sum of the streams contributing to it. The company seeks, by an exercise of the right of eminent domain, to acquire an absolute right to 10,000,000 gallons daily of the normal flow of Perkiomen Creek. We assume for the purposes of this case, but do not decide, that the company may properly exercise this power. It is obvious that in dry seasons so large a taking may prevent Philadelphia from obtaining the volume of water from the Schuylkill to which it has a prior claim. Faced with this situation, we are compelled to decide that the proposed diversion from Perkiomen Creek would in times of minimum flow constitute an invasion of the rights of Philadelphia. This does not mean that the city is entitled to have the flow of the Perkiomen, or any other tributary of the river, undiminished at all times; the city's only right is to enough water to meet its present and reasonable future needs—at the present time 200,000,000 gallons a day. As to any taking which will not interfere with that right, the city can have no objection. The rule laid down in 27 R. C. L. 1264, section 173, seems fair: "The residue remaining after a prior appropriation may be appropriated by others out of the waters of the same stream if there is no interference with the prior appropriator."

It is argued by counsel for the company that the city must first make reasonable effort to conserve the water of the Schuylkill before it can insist upon its present claim to the minimum flow. In the absence of proof of waste by the city, and in view of the fact that the Schuyl-

kill has, even in extremely dry years (like 1881 and 1896), met all of the city's needs, we can well understand why Philadelphia has not thought it necessary to make large expenditures of money for conserving water. We feel, therefore, that under the circumstances of this case it cannot be determined as a matter of law that the city heretofore was required to conserve and impound water during flood time before it could claim its accustomed amount from the Schuylkill. What its obligations in this respect may be in the future is not now being decided. The city must conserve water, if and when conservation is necessary: Palmer Water Co. v. Lehighton Water Supply Co., supra. We do not believe there is a present justification for requiring the city to build dams and reservoirs to increase and equalize the flow of the Schuylkill. The injustice of such a requirement is obvious when it is considered that the company has potential supplies of water fully sufficient to meet its present and reasonable future needs in streams the flow of which it has already condemned. This is not a case where the water that the first taker permits to go to the sea is the only supply available to the junior comer.

The Schuylkill is a navigable river, and in its waters the interests of navigation are second only to the paramount right of riparian owners to take water for domestic use: Phila. v. Collins, supra; Phila. v. Gilmartin, supra; Hunt v. Graham, 15 Pa. Superior Ct. 42. Any right of Philadelphia to take water from the river, except for domestic use, even for manufacturing purposes, is subordinate to the right of those using it as a highway: Gallagher v. Phila., 4 Pa. Superior Ct. 60. In other words, Philadelphia can only get the 200,000,000 gallons per day to which it is entitled after the needs of navigation and those of riparian owners for domestic purposes have been served.

It is ordered, adjudged and decreed that the defendant, Philadelphia Suburban Water Company, is re-

strained from interfering, by the diversion of water from Perkiomen Creek, with a flow of the Schuylkill River at Philadelphia of 200,000,000 gallons per day, over and above the requirements of navigation.