581 A.2d 984

COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, Petitioner,

v.

PHILADELPHIA SUBURBAN WATER COMPANY, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 30, 1990.

Decided Sept. 26, 1990.

Reargument Denied Nov. 21, 1990.

Scott R. Thistle, Asst. Counsel, for petitioner.

David B. MacGregor, with him, Wayne R. Dillahey, Morgan, Lewis & Bockius, Philadelphia (Mark J. Korpilak, of counsel), for respondent.

Before DOYLE and SMITH, JJ., and BARBIERI, Senior Judge.

DOYLE, Judge.

This is an appeal by the Department of Environmental Resources (DER) from an order of the Environmental Hearing Board (EHB) which sustained an appeal filed by the Philadelphia Suburban Water Company (PSWC). In its order the EHB declared null and void a modification order issued by DER to PSWC's allocation permit WA–67 and also declared null and void water allocation permit WA46–693A which DER had issued to the North Wales Water Authority (NWWA).

The relevant facts are undisputed. PSWC is an investor-owned public utility. It is regulated by the Pennsylvania Public Utility Commission and supplies water to sixty different municipalities throughout the Delaware, Montgom-

ery and Chester County area serving about two-hundred-thirty thousand customers in a thirty-five square mile area. NWWA supplies water to seven municipalities in Bucks and Montgomery Counties. Both companies are "public water supply agencies" as that term is defined in Section 1(b) of the Act of June 24, 1939, P.L. 842 (Act),[1] 32 P.S. § 631(b).

On May 14, 1980 PSWC entered into an agreement with NWWA to make available a supply of supplemental water through the same service connection the two companies had been employing since 1964. The agreement does not guarantee the availability of a specific quantity of water or the delivery of water. Further, it does not specify what source PSWC will utilize to supply NWWA with water. The agreement is terminable by either party upon sixty days notice prior to its year-to-year term. The intent of the parties in entering into the agreement was to provide a short-term arrangement for a supplemental water supply pending completion of the Point Pleasant project which would then supply NWWA the water it needs. It is undisputed that NWWA's own sources are insufficient to meet its water needs.

On April 30, 1984 DER, by letter, informed NWWA that it was necessary to obtain a subsidiary water allocation permit for its service connection with PSWC. NWWA filed an appeal with the EHB from this letter. Thereafter, NWWA filed with DER an application for a subsidiary water allocation permit covering, *inter alia*, the connection with PSWC. On November 14, 1984 DER, by letter, informed PSWC of NWWA's application and that any allocation approved for NWWA would be offset against PSWC's existing allocation. PSWC was invited to respond to the letter and did so by stating that since the water supplied to

1. Section 1(b) defines "public water supply agency" as:
[A]ny corporation or any municipal or quasi-municipal corporation, district or authority, now existing or hereafter incorporated under the laws of the Commonwealth of Pennsylvania and vested with the power, authority, right, or franchise to supply water to the public in all or part of any municipal or political subdivision of the Commonwealth of Pennsylvania.

NWWA was ground water [2] rather than surface water [3] no subsidiary permit was needed. The letter, authored by a PSWC official, also stated "I do not object to the issuance of an allocation; however, I believe it is not necessary." On March 18, 1985 DER issued the permit to NWWA, thus authorizing NWWA to buy up to five hundred thousand gallons per day from PSWC. PSWC was notified of this permit issuance and was also sent a modification order which essentially required PSWC to "reserve" five hundred thousand gallons per day for NWWA.[4]

On April 11, 1985 NWWA withdrew its appeal to the EHB. On April 25, 1985, however, PSWC filed an appeal with the EHB challenging both NWWA's allocation permit and the modification of its own permit. A hearing was held before the EHB. A joint stipulation of certain facts was entered into the record. There was also oral and documentary evidence presented. After the hearing the EHB sustained the appeal holding that DER has no authority under the Act to issue permits for the right to purchase, through a pipeline interconnection, water already in the distribution system of another public water supply agency. DER has appealed [5] and we are now presented with a question of first impression as to the extent of DER's permitting authority under the Act.

We begin our analysis with a brief review of Pennsylvania's water allocation system. Prior to the Act,

2. Ground water is defined as "water that naturally lies or flows under the surface of the earth." Restatement (Second) of Torts § 845 (1977).

3. Surface water is defined as "water from rain, melting snow, springs or seepage, or detached from subsiding floods, that lies or flows on the surface of the earth but does not form a part of a watercourse or lake." Restatement (Second) of Torts § 846 (1977).

4. The EHB found and it is not in dispute that because of confusion over the meaning of "reserve" DER now uses the term "recognize" in subsidiary water allocation permits. This point is not an issue in this case.

5. There is also another case on appeal to this Court concerning the same legal issue. The two cases were consolidated for oral argument but we shall write the decisions separately. *See Department of Environmental Resources v. Keystone Water Company*, (No. 2009 C.D. 1989, filed September 26, 1990).

the paramount rights were those of riparian owners, who were entitled to take water for domestic uses. *Philadelphia v. Philadelphia Suburban Water Co.*, 309 Pa. 130, 163 A. 297 (1932). Next in importance was the public's right of navigation on navigable streams. *Id.* Municipalities' right to procure water from rivers for use by the general population had its basis in statutory rather than common law as distinguished from non-municipal public water supply agencies. *See Philadelphia and Reading Railroad Co. v. Pottsville Water Co.*, 182 Pa. 418, 38 A. 404 (1897); *Haupt's Appeal*, 125 Pa. 211, 17 A. 436 (1889). Eminent domain was the statutory method authorizing municipalities to take water. *Philadelphia and Reading Railroad Co.; Haupt's Appeal.* But, while a municipality could build a reservoir and channel water to its citizens, it was prohibited from furnishing water outside its territorial boundaries. *Stauffer v. East Stroudsburg Borough*, 215 Pa. 143, 64 A. 411 (1906) (adopting trial court opinion).

In 1939, however, the legislature abolished the eminent domain system for individual municipal water allocation and instead vested allocation authority with the Water and Power Resources Control Board, which later became a part of the Department of Environmental Resources. *See Delaware River Basin Commission v. Bucks County Water and Sewer Authority*, 474 F.Supp. 1249 (E.D.Pa.1979), *vacated on other grounds*, 641 F.2d 1087 (3rd Cir.1981).

The reasons why the Act was enacted are set forth in its preamble:

WHEREAS, An adequate and safe supply of water for the public is a matter of primary concern affecting the life, health and comfort of the people of this Commonwealth; and

WHEREAS, The increase of the population makes it necessary that the available supply of water be conserved, controlled and used equitably for the best interests of all concerned; and

WHEREAS, The use of water for the supply of water to the public is the most essential of all public service, vital to life itself; and

WHEREAS, The public interest requires that public water supplies be developed not only for present needs but also for developing needs for a reasonable time in the future from and after any original appropriation or acquisition of a source of supply; and

WHEREAS, The public interest requires that sources of water supply appropriated or acquired but not used or not reasonably necessary for future needs should be available for appropriation or acquisition by others requiring such sources.

By its express terms the Act deals only with "surface waters."[6] Under the Act a public water supply agency may apply to DER for a water permit.[7] DER, upon receiving a permit application, is required to make an investigation, including a search of its water acquisition record, and determine whether a conflict of interest is present. If no conflict exists and it determines that "the water or the water rights proposed to be acquired are reasonably necessary for the present purposes and future needs of the public water supply agency making application, that the taking of said water or the exercise of said water rights will not interfere with navigation, jeopardize public safety, or cause substantial injury to the Commonwealth," it must issue a permit.[8] DER is also empowered to revoke permits where water is not actually acquired by the permitee within four years of the permit's issuance, absent a good faith delay.[9] The Act also gives public water supply agencies the right of

---

**6.** Section 1(e) of the Act, 32 P.S. § 631(e). PSWC's sources include both surface and ground water. No argument has been presented on appeal that the waters here (which apparently are from different sources and may be commingled) are outside the Act's scope.

**7.** Section 6 of the Act, 32 P.S. § 636.

**8.** Section 7 of the Act, 32 P.S. § 637.

**9.** Section 8 of the Act, 32 P.S. § 638.

eminent domain with respect to the water rights authorized by their permits.[10]

With this background in mind we now move to a consideration of the legal issue before us. We begin by setting forth the relevant statutory provision. Section 6 of the Act provides:

> Hereafter no acquisition of *water rights* shall be made or taken by any public water supply agency except as follows:
>
> Any such public water supply agency desiring to acquire new water rights, *a new source of water supply,* or to acquire *an additional quantity of water* or water rights from an existing source of water supply, beyond that confirmed by the board[11] under the preceding sections of this act as being reasonably necessary for present purposes and future needs, shall make application to the board for a permit to acquire such designated waters or water rights, setting forth such of the following information as may be applicable:
>
> 1. The river or stream from which the supply is proposed to be taken and the necessity for such *new water rights, new source, or additional quantity.*
>
> 2. The amount of water which it is proposed to acquire for present purposes and future needs.
>
> 3. The district, municipality or political subdivision, and the population thereof, requiring the supply, and the necessity for such acquisition.
>
> 4. The plan for development or use of the water, including the capacities of any proposed impounding reservoirs.
>
> 5. Such other or additional applicable information as the board may require. (Emphasis added.)

The pertinent definitions provided by Section 1 of the Act are as follows:

10. Section 9 of the Act, 32 P.S. § 639.

11. DER has assumed the duties of the Water and Power Resources Control Board.

(c) "Acquire" shall mean to secure or become vested with rights, either by purchase, lease, gift, devise, adverse possession, prescription, eminent domain, waiver of damages, settlement of damages, appropriation, or otherwise.

(d) "Acquisition" shall mean the act of acquiring or the rights acquired.

(e) "Water rights" shall mean the right to take or divert water from any rivers, streams, natural lakes and ponds, or other surface waters within or partly within and partly without the Commonwealth of Pennsylvania. . . .

32 P.S. § 631(c), (d), (e).

DER contends that the bulk transfers of water at issue here are encompassed in Section 6 by the phrases "new source of water supply" and "additional quantities of water" if not as new water rights. It thus argues that the activity here is within its permitting authority. Alternatively, DER maintains that the two phrases serve to define further "water rights" as that term is employed in Section 1(e) of the Act.

PSWC maintains that the Act applies only to the acquisition of "water rights" as that term is defined in Section 1(e). It asserts further that the Act is narrow in scope, applying only to the taking of water from a surface source by a public water supply agency. And, it contends that if DER's position is adopted the result will be "to transform a short-term, interruptible, non-sale of treated water into a permanent transfer of PSWC's vested water rights to NWWA" and that such result would deter interconnection agreements which agreements are essential to providing reliable water service in the Commonwealth.

We begin by acknowledging the very real possibility that the legislature never envisioned the scenario of bulk water transfers when it enacted the Act in 1939.[12] The fact that it may not have done so, however, does not necessarily mean such transfers are outside the Act. Certainly the legislature cannot be expected to envision every possible factual

12. There is a dearth of legislative history on the Act so no help in divining the legislative intent may be obtained from that source.

matrix when it enacts the various laws. One thing, however, is evident; Section 6 contains a clear ambiguity. It first speaks of the acquisition of "water rights". It then speaks of four items a public agency may acquire. (1) New water rights, (2) a new source of water supply (3) an additional quantity of water (4) additional water rights from an existing source of water supply. Two of these items, "new water rights" and "water rights from an existing source of water supply," are clearly water rights. As to the other two, "a new source of water supply" and "an additional quantity of water," the language is confusing. If a new source and an additional quantity are water rights, why did not the legislature explicitly say so by adding the words "water rights in" before "a new source" and again before "an additional quantity." If, on the other hand, it wished to address the right to obtain water without obtaining water rights why did it not say so more clearly elsewhere in the Act. The statute's ambiguity and the resulting bumfuzzlement lead us to conclude that resort to the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501–1991, is required.

Therein we are advised that the object of all statutory interpretation is "to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). We are further instructed that:

When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

We are also guided by the presumption that "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable," 1 Pa.C.S. § 1922(1), and that it "intends to favor the public interest as against any private interest." 1 Pa.C.S. § 1922(5).

 Turning now to the language of the Act, and particularly Section 6, we begin our application of the aforestated principles. The Act's preamble, while not controlling, *see* Section 1924 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1924, is helpful in construing the statute. From it we learn of the legislature's concern that water be conserved, controlled, and used equitably for the best interests of all concerned; that supplies be developed for both present and future needs; and that waters appropriated but not used or necessary for future needs be made available to others requiring them. Thus, the legislature evidenced a concern that water sources be developed, conserved and equitably apportioned throughout the state. To this end it created a single entity responsible for permitting public water supply agencies, *see Collegeville Borough v. Philadelphia Suburban Water Co.*, 377 Pa. 636, 648, 105 A.2d 722, 728 (1954), no doubt to be certain that the needs of all the Commonwealth's citizens would be met. Having identified the Act's purposes, we move now to a consideration of the consequences of the various interpretations proposed to us.

 PFWC contends that service connections between public water supply agencies are beneficial because they allow agencies to acquire additional short term water supplies, thus postponing major capital expenditures. Such connections also insure emergency backup supplies. But PSWC asserts that if entering into such connections will subject the supplying agency to a loss of its water rights or a reexamination of the buyers and sellers existing permits, service connections will be discouraged.

DER counters that if bulk transfers can be performed without its knowledge and approval it would be unable to carry out its statutory duty to insure conservation, control,

and equitable use. It expresses concern that if the agencies do their own allocation or reallocation the notion of a single tribunal responsible for statewide allocation will be rendered nugatory. It also contends that without being able to issue the subsidiary permits it could not perform its duty to keep an inventory or water acquisition record as it is statutorily obliged to do. *See* Section 4 of the Act, 32 P.S. § 634. Finally, it asserts that without being able to require subsidiary permits it could not subject the purchasing companies to certain permitting conditions concerning, *inter alia,* conservation, leakage loss control, metering, and drought contingency plans.

While PSWC maintains that DER can gain this information from the purchasing agencies other water allocation permits authorizing the purchasing agencies' direct withdrawal, DER expresses concern as to the existence of a "substantial" number of public water supply agencies which have only interconnections and no direct water sources. Unless DER can issue subsidiary permits, these agencies would be outside the scope of the Act and, hence, DER could not obtain information from them. DER also counters that certain sewage disposal information is available nowhere else and that attempting to obtain this information via the Pennsylvania Safe Drinking Water Act [13] and its attendant regulations, as PSWC suggests, would not be feasible because that act regulates drinking water quality and "has questionable authority with regard to quantity and resource issues." DER's Reply Brief p. 13.

As we review these arguments and counter arguments we come to believe that the parties' interests are not as far apart as might first appear. DER in its role as *parens patria, see Collegeville Borough,* wishes to conserve water and see that it is allocated fairly. PSWC, as a for-profit corporation, wishes to provide a service to the public in an efficient manner so that it may attract customers and increase its revenues. Both have as a broad goal, albeit for different motives, to serve the public. DER's concern that

13. Act of May 1, 1984, P.L. 206, 35 P.S. §§ 721.1–721.17.

it must be able to regulate water acquisition is justifiable; PSWC's concern that it not lose valuable water rights it has worked to develop is equally so.

We conclude that the Act can be read to meet both parties' concerns.

First, we must acknowledge that Section 6 appears to be internally inconsistent. The first sentence clearly speaks only of "water rights." The second sentence and the first criterion for which information is sought appear to expand the scope the statute seeks to cover. Section 1933 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1933, dictates that where two provisions within the same statute are in conflict, the special provision shall prevail unless the general provision is enacted later and it is the manifest intention of the General Assembly that the general provision prevail. Further, Section 1934 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1934, provides that where there are irreconcilable clauses within the same statute "the clause last in order of date or position shall prevail." In Section 6 the second sentence and the first criterion are more specific than the first sentence. Moreover, the second sentence and the first criterion are also later in position than the first sentence. Further, we note that the entire statute was enacted at the same time. Accordingly, we conclude that to the extent a conflict exists, the language which is later in position and more particularized must control.

We, therefore, hold that Section 6 of the Act sets forth four types of acquisition, two of those, "new water rights" and "additional water rights from an existing source," pertain to acquiring "water rights" as that term is defined in Section 1(e) of the Act, and the other two types of acquisitions, "a new source of water supply" and "an additional quantity of water" pertain simply to acquiring water without the necessity of acquiring new water rights as well.[14] All four acquisitions require a permit. This satis-

14. We observe that "acquire" is defined as to secure or become vested with "rights." It does not say water rights as defined in Section 1(e).

fies DER's "need to know." Only two (those not in issue here) involve a transfer of "water rights," thus protecting PSWC's interests. This reading of the statute not only addresses the concerns of both parties, but benefits the public by encouraging bulk transfers of water, yet allowing DER to maintain a handle on those transfers.[15]

■ Finally, we move to PSWC's allegation that DER should, in essence, be estopped from requiring subsidiary permits because for a long time it did not do so.[16] Even assuming this to be true, an agency cannot be estopped from performing its statutory duties. *Commonwealth v. Western Maryland Railway Co.*, 377 Pa. 312, 105 A.2d 336 (1954), *cert. denied.*, 348 U.S. 857, 75 S.Ct. 82, 99 L.Ed. 675 (1954); *Farmers Bank and Trust Co. of Hummelstown v. Department of Banking*, 43 Pa. Commonwealth Ct. 325, 327 n. 2, 402 A.2d 323, 324 n. 2 (1979).

Based upon the foregoing analysis, we reverse the order of the EHB.

## ORDER

NOW, September 26, 1990, the order of the EHB in the above captioned matter is hereby reversed.

SMITH, J., dissents.

---

The purchasing agency thus acquires an additional quantity of water, but its rights to that quantity are defined by the purchasing agreement, not the Act, and DER's modification of PSWC's permit must be read in that manner.

15. We note that both parties argue the applicability of a 1940 Attorney General opinion which we find to be inapposite as it does not concern bulk transfers of water under the Act.

16. No argument is made that DER has discriminated against PSWC in enforcing the Act.